**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Court of Criminal
Appeals
Clerk
Austin, Tx 78711

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly)  B. Date of Delivery
The Clerk  7-6-5 7-2000

C. Signature
☐ Agent
☐ Addressee

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Certified Mail  ☐ Express Mail
☐ Registered  ☐ Return Receipt for Merchandise
☐ Insured Mail  ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number (Copy from service label)
Z 554 233 726

PS Form 3811, July 1999    Domestic Return Receipt    102595-00-M-0952

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Corpus Christi
D.A. Office
appellate section
Nueces county
courthouse
Corpus, Tx 78401

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly)  B. Date of Delivery

C. Signature
☐ Agent
☐ Addressee

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☑ Certified Mail  ☐ Express Mail
☐ Registered  ☐ Return Receipt for Merchandise
☐ Insured Mail  ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number (Copy from service label)
Z 554 233 718

PS Form 3811, July 1999    Domestic Return Receipt    102595-99-M-1789

---

Z 554 233 726

**US Postal Service**
**Receipt for Certified Mail**
No Insurance Coverage Provided.
Do not use for international Mail (See reverse)

Sent to
Court of Criminal Appeals
Street & Number
Austin, Tx 78711
Post Office, State, & ZIP Code
Clerks off.

Postage

Certified Fee

Special Delivery Fee

Restricted Delivery F

Return Receipt Show
Whom & Date Delive
Return Receipt Showing w
Date, & Addressee's Addr

TOTAL Postage & Fee

Postmark or Date

PS Form 3800, April 1995

---

Z 554 233 718

**US Postal Service**
**Receipt for Certified Mail**
No Insurance Coverage Provided.
Do not use for international Mail (See reverse)

Sent to
D.A. Office
Street & Number
Nueces county courthouse
Post Office, State & ZIP Code

Postage

Certified Fee

Special Delivery Fee

Restricted Delivery Fee

Return Receipt Showing
Whom & Date Delivered
Return Receipt Showing to Wh
Date, & Addressee's Address

TOTAL Postage & Fees

Postmark or Date

PS Form 3800, April 1995

1          Now, Your Honor, I move the Court

2   to --

3          THE COURT:  Did you want a ruling?

4          MR. TINKER:  I'm sorry?

5          THE COURT:  Do you want a ruling?

6          MR. TINKER:  Yes.  I'd like a ruling.

7          THE COURT:  I deny it.

8          MR. TINKER:  Your Honor, at this time

9   I do ask the Court to dismiss the jury panel

10  because the prosecutor's office has systematically

11  excluded a specific racial group from the jury

12  panel.  They've excused --

13         THE COURT:  Excuse me.

14         Can I have the strike list?

15         Mr. Tinker, I've just been informed

16  that -- this is back on the broadcast business --

17  I've just been informed that for some -- I

18  certainly would like to hear it, if you want to

19  visit further, but I've just been informed that all

20  the audio is restricted to the media, and it was

21  restricted to the media room.

22         MR. TINKER:  I'm going to call a

23  witness up from the media.

24         THE COURT:  The Court acknowledges

25  that it's going to the media trucks.

814

(C) S.Oballe 1995 -- All Rights Reserved

1          But to the best of my knowledge, it

2    was not being distributed; and, also, I'd like to

3    state that anybody in that area has to have a red

4    badge.

5          MR. TINKER:  Well, Arnold Garcia

6    didn't have a red badge, to which he'll testify.

7    Some of the jurors were standing on the balcony.

8          THE COURT:  Excuse me.  Mr. Tinker,

9    we will not have a conflict.

10          MS. LA FLEUR:  I will check on that.

11          THE COURT:  I am reactivating the --

12    is it being transmitted now?

13          MR. TINKER:  Again, I think before we

14    went back to that issue, Your Honor, we were -- I

15    had objected to the impaneling of the jury under

16    the Batson Case because the prosecution had

17    systematically excluded the African Americans from

18    the jury.  My records reflect that's Juror Nos. 13,

19    21, 26, 34, 38, 39, 48 and 49.

20          THE COURT:  Okay.

21          MR. SKURKA:  May I be heard on this,

22    Judge?

23          THE COURT:  Certainly.

24          MR. SKURKA:  First of all, Your

25    Honor, we again -- we reiterate what Mr. Valdez

827

(C) S.Oballe 1995 -- All Rights Reserved

1       MR. SKURKA:  He wants the record to

2   reflect that we systematically excluded Blacks?

3   I'm telling the Court that is not what we did, and

4   I object to that insinuation because of the thing

5   that we mentioned earlier.

6       THE COURT:  Okay.

7       Anything further?

8       MR. TINKER:  Not on this issue, Your

9   Honor.

10      THE COURT:  All right.  You said you

11  wanted to argue?

12      MR. TINKER:  Your Honor, I just --

13  it's my position they have the burden once we show

14  that they -- in almost all the African-Americans or

15  the racial group has been excluded they've got the

16  burden of proof to show there was some other reason

17  other than race that caused those folks to be

18  stricken.  They haven't done so, so I request,

19  again, that this panel be quashed.

20      THE COURT:  Overruled.

21      Next matter.  We'll be right there in

22  a second.  We've  got five minutes.

23      MR. TINKER:  Do we have five minutes

24  to run to the --

25      THE COURT:  You've got five minutes

833

(C) S.Oballe 1995 -- All Rights Reserved

1    objection.

2            The Court started off this hearing by

3    saying, "Mr. Tinker, I saw no inclination for you

4    to make a Batson Challenge." That's very clear in

5    the Court's own mind that that was not his intent

6    at that time.

7            Secondly, Judge, we -- our objection,

8    too, is that he claimed that we're doing a

9    systematic discrimination of Afro-Americans. And

10   the Court -- I guess it's pretty obvious on the

11   record, but the defendant in this case is not an

12   Afro-American. The case law, again, cited in Perry

13   vs. State, 770, 950, says that Batson error is

14   limited to allegations of strikes of members of the

15   defendant's own race. Defendant could not raise

16   Batson error as to exclusion of members of other

17   races.

18           THE COURT: All right. But, just out

19   of an abundance of caution, do you wish to state in

20   the record your reasons for those strikes?

21           MR. SKURKA: If the Court requires me

22   to.

23           THE COURT: I'm not requiring it.

24           MR. SKURKA: First of all, the burden

25   is on him to show that there is an inference of

830

(C) S.Oballe 1995 -- All Rights Reserved

1           MR. TINKER:  And they understand this

2   applies to opening statements as well, Your Honor?

3           MR. VALDEZ:  To what?

4           MR. TINKER:  Opening statements as

5   well.  It goes to that.

6           MR. VALDEZ:  I understand.

7           THE COURT:  All right.

8           Incidentally, while we're on the

9   subject of opening statements, how much time do

10  you-all want to make your opening statements,

11  Mr. Valdez?

12          MR. VALDEZ:  No longer than 20

13  minutes, Your Honor.

14          THE COURT:  Mr. Tinker?

15          MR. TINKER:  I might take a little

16  longer than that, Your Honor.

17          THE COURT:  Thirty minutes?  Each

18  side will have 30 minutes, but there is no

19  cumulative.

20          MR. TINKER:  I can't save some of

21  it?

22          THE COURT:  No.

23          Mr. Tinker.

24          MR. TINKER:  Yes.  Your Honor, with

25  regard to the -- again, as the Court recalls that I

807

(C) S.Oballe 1995 -- All Rights Reserved

1  approached the bench and wanted to make some

2  objections to the impaneling of the jury, and Your

3  Honor permitted me to do that after the jury was

4  seated.  Do you recall that?

5            THE COURT:  Okay.  That was a very

6  important question.

7            I want both of you gentlemen to be

8  very careful from now on about any contact with the

9  Court, particularly if it's on the record, when

10  both sides are not present, because I thought

11  someone from the State was present.

12            MR. VALDEZ:  I was present, Your

13  Honor.  That didn't happen.  It's on the record.

14  It didn't happen.

15            THE COURT:  Have you already examined

16  the record?

17            MR. VALDEZ:  No, sir, I haven't, but

18  that didn't happen.

19            THE COURT:  What the Court recalls to

20  be on the record, Mr. Tinker, I had no inclination

21  about passing the challenge at the time you

22  admitted that.

23            MR. TINKER:  Your Honor, let me say

24  this:  I had no inclination as to pass the

25  challenge because I hadn't seen the color of the

(C) S.Oballe 1995 -- All Rights Reserved

1    faces; and then, as they were seated, at the time

2    that they did, I knew that I should do that, and I

3    made it.

4                    THE COURT:  Well.

5                    MR. VALDEZ:  Your Honor, what

6    happened yesterday at the sidebar is that

7    Mr. Tinker wanted to reserve -- request from the

8    Court additional preemptory challenges.

9                    He said, "Can I do that afterwards?"

10                   The Court said, "Yes, you can.

11                   I will reserve that until later."

12                   He didn't say anything about passing.

13                   THE COURT:  Excuse me.  He did say

14   something about the normal objection to the failure

15   of the Court to grant his challenges for cause,

16   which is actually part and parcel of the request

17   for additional --

18                   MR. VALDEZ:  Your Honor, if I may

19   address the Court?  When the Court called us up

20   there to review the strikes, the list, the final

21   list, Mr. Tinker went up there and I went up there,

22   we reviewed the list and Mr. Tinker's only comment

23   was making fun of the State of Texas because we had

24   own struck nine people.  That was the only comment

25   he made.  He didn't object to the panel, he didn't

(C) S.Oballe 1995 -- All Rights Reserved

1    say anything.  That was the proper time to make a

2    Batson objection.  Anything later than that, after

3    the jury had been impaneled, is not timely, Your

4    Honor, and nothing's reserved.

5                    THE COURT:  All right.

6                    MR. TINKER:  Your Honor, my position

7    is that it is reserved.  I asked the Court whether

8    I would have an opportunity, Your Honor wanted to

9    go ahead and get the jury seated.

10                   And I said, "Well, can I take these

11   matters up after the jury is seated?"

12                   And it's my recollection that you

13   said "Yes," and I'd like to take them up now.

14                   THE COURT:  I'm going to allow you to

15   take them up.  It's actually up to somebody else to

16   determine whether they were reserved or not.  As

17   Mr. Tinker knows, I make no warrants about

18   anything.

19                   MR. TINKER:  Your Honor, further, I

20   would like to address the issue with regard to the

21   challenges for cause that I made.  The Court will

22   recall that when certain jurors were questioned in

23   dealing with the -- first, the bias or prejudice

24   against the probation laws, Your Honor denied.  I

25   told the Court I wanted additional challenges, you

(C) S.Oballe 1995 -- All Rights Reserved

1  previous instructions; that you're not to discuss

2  the case even among yourselves until the proper

3  time, which is at the end of the case; that you're

4  not to discuss the case with anyone whomsoever and

5  it's best not to even indicate the case because of

6  the nature of the case; I also instruct you, as I

7  previously instructed you, not to view police or

8  news reports, press or media checks, any media.

9  And you've demonstrated appropriate behavior before

10  and indicated your willingness to abide by that.

11  These are very important instructions in this

12  case.

13              Those are the extent of my

14  instructions at this time and I'm going to dismiss

15  you shortly and ask that you return tomorrow at

16  9:00 o'clock.  I'm going to direct you into the

17  jury room where there will be some additional

18  instructions concerning your comings and goings in

19  the courtroom.  So thank you for your attention and

20  I will now leave you with the court personnel.

21              (Jury panel released - 6:07 p.m.)

22              THE COURT:  All right.  We're still

23  in session.

24              Mr. Tinker, you indicated that you

25  had some objections?

787

(C) S.Oballe 1995 -- All Rights Reserved

1       MR. TINKER: Well, first, Your Honor,

2  I want to voice my objection, we have 11 law

3  enforcement people, I've made a record of that, I

4  think it gives the jury the impression that my

5  client is dangerous. They're not guarding the

6  door, they're guarding Yolanda, and I object to

7  that. And I object to what it -- how it damages

8  her in her -- it's to receive a fair trial, it's

9  going to cause this jury to believe that some way

10  she is a serious criminal and likely to escape.

11       Secondly, Your Honor, with regard to

12  the jury selection, I just want to make a note that

13  the juror -- the prosecution has struck all but one

14  of the African-Americans that were on the panel.

15  They systematically, in my view, have stricken the

16  Blacks, African-Americans, from this panel.

17  There's only one African-American there. They have

18  struck eight African-Americans from the panel.

19  They struck 13, 21, 26, 34, 38, 39, 48, and 49. We

20  demand that the panel be quashed because of the way

21  they did their striking, and they did it in a

22  prejudicial way by striking racially.

23       THE COURT: Response?

24       MR. SKURKA: First of all, Judge,

25  this is an untimely motion. The jury is sworn and

(C) S.Oballe 1995 -- All Rights Reserved

1   in the box.  That's my first response.

2                   THE COURT:  Well, you weren't present

3   but your co-counsel would have been.

4                   MR. VALDEZ:  Pardon me, Your Honor?

5                   THE COURT:  That was preserved on the

6   record here.

7                   MR. TINKER:  I think it was.  I asked

8   if I could exercise my challenges.

9                   THE COURT:  Someone was here.

10                  MR. TINKER:  I said, "Could I do that

11  after?"

12                  THE COURT:  First of all, I think

13  it's been a long day and if there's any question

14  about being able to do it later it's not going to

15  make any difference if you do it in the morning.

16                  MR. TINKER:  I'm right.  The only way

17  that they can recover from this is if Your Honor

18  rules in our favor is to see the African-Americans

19  that we challenged if there is -- there's still a

20  chance -- that were challenged by them get those

21  jurors back and put them on the jury.  Secondly,

22  then, Your Honor, I ask to quash the entire panel.

23                  THE COURT:  Defense, there's no

24  reason why it can't be done in the morning.

25                  MR. TINKER:  With regard to the other

(C) S.Oballe 1995 -- All Rights Reserved

1           MR. TINKER:  Your Honor, the next

2  motion I have is a -- let me go through these motions --

3  for the criminal records of the witnesses.  I have

4  prepared a Motion Requesting the Criminal Records of the

5  Witnesses.  I have also prepared an order.  That Order has

6  attached to it those witnesses who that I know, that there

7  have been indications will be witnesses in this case.

8  Those that I could ascertain the date of birth, I have

9  prepared the date of birth and all I request, Your Honor,

10  is sometimes prosecutors say:  Well, why should we do Mr.

11  Tinker's work?

12           All I'm requesting is that you sign the order

13  which I have attached authorizing me to go to law

14  enforcement agencies and get that information.  And I

15  would just request, I guess, a response from counsel.

16           THE COURT:  Yes.

17           MR. SKURKA:  I'm ready to respond to

18  that, Judge.  The case law in this area indicates that he

19  is not entitled to just a flat-out fishing expedition for

20  a search of peoples' criminal records.  The only thing

21  that is admissible against these people are impeachable

22  materials; that is, that they have been convicted of a

23  felony or a crime involving moral turpitude.  He has given

24  me a laundry list of all the witnesses, basically, who I

25  have subpoenaed, the civilian witnesses, and he wants to

1    know if they have a criminal record or not.

2            My response to that, Your Honor, is their

3    criminal record, just blanket criminal record is not

4    discoverable.  It may show arrests, it may show crimes

5    that do not fit into this category of impeachable offense.

6    I know under Brady that I have an obligation to hand him

7    things which are impeachable things.  If I have a witness

8    who has been convicted of two felonies before, I have to

9    tell him about that.  If I have a witness that's been

10   convicted of theft, I have to tell him about that.

11           THE COURT:  That's any theft, I take

12   it?

13           MR. SKURKA:  That's correct.  And

14   that's what the law says, Judge.

15           My proposal to answer this, Your Honor, is

16   not to give him directly, not to let him have access to

17   criminal law records.  TCIC, NCIC, it's very closely

18   guarded by the law enforcement personnel and there is all

19   kinds of rules about who they can give that stuff to.

20           My suggestion to the Court is, that if the

21   Court grants this order, is that I prepare a -- or have my

22   investigator prepare a criminal history list, a sheet, a

23   rap sheet on each of these people if they have it, or

24   just -- I hate to say "rap sheet," because that makes it

25   sound like they all have records and they probably don't.

1          That report, that inquiry made of the

2    computer, TCI, NCI computer report should then be turned

3    over to the Court en camera, and then the Court can

4    determine whether any of those items are discoverable,

5    meaning impeachable offenses that should be turned over to

6    the defense.  I don't think he should be allowed to know

7    if somebody has got a DWI from 10 years ago, or for some

8    crime that -- or been arrested that didn't result in a

9    conviction that he cannot use --

10              THE COURT:  Yes.

11              MR. SKURKA:  And again, I will tell

12   you, I don't know if these people have criminal records or

13   not.  My guess is, they don't.

14              THE COURT:  I think I understand.

15         Your response.

16              MR. TINKER:  My response is this, Your

17   Honor.  It's not only when people have prior convictions

18   that, that prior problems with the law is admissible.

19   Davis --

20              THE COURT:  What's that?  What's --

21              MR. TINKER:  That's a -- there's a

22   pending charge against a person who had, a young man who

23   has a pending charge.  He has not be convicted of it, but

24   because of the pending charge it might show why he would

25   testify favorably for the prosecution --

0000 0000 3813 2465

1          THE COURT:  Well, let me interrupt.

2          MR. SKURKA:  I didn't understand that.

3          THE COURT:  Can we divide this between

4  the issue of, the procedural issue that he is suggesting,

5  where he presents it to the Court, and then let you

6  address the Court on what's --

7          MR. TINKER:  Your Honor, here is, I

8  think the probably most efficient way to do it.  I think

9  that there are certain things that he has already agreed

10  that we're entitled to, and those are convictions and --

11  convictions for felonies, convictions, and theft.  I

12  suggest that he should provide that.  What I worry about,

13  I know -- and I have done it in the past -- when I have

14  been given an order such as this, what they get out of the

15  NCIC doesn't really show what's there, because what

16  happens is you can be convicted of theft in County Court

17  many times -- particularly if it's several years old, and

18  then it never does get in the computer.  That's only in

19  recent times they started doing that.  But if I take the

20  order, or if anybody takes the order that I'm asking Your

21  Honor to sign, to the Sheriff's Department in the

22  community where a witness might live, if they don't live

23  here, you can get substantially more information than you

24  can if you just rely on what they get out of the NCIC

25  reports.

0000 0000 3813 2486

1              THE COURT:  Well, Counsel, can't you

2   also get that from County Clerks and District Clerks?

3              MR. TINKER:  No, because what happens,

4   Fred Mannins (phon.sp.), who is the records keeper for the

5   Sheriff's Department, you can take an order like this and

6   it just amazing what he will have that they don't get when

7   they go into NCIC.  So my suggestion, first, to speed it

8   up is that Your Honor get some -- I don't mind if you get

9   some member of your staff or that they get some member of

10  their staff and go and get that information from the

11  Sheriff's Department here, all of it, on any of these

12  folks and get back to us.

13             I also am concerned about maybe one or more

14  of the witnesses may have been convicted, gone to the

15  penitentiary and have a pardon.  My position is that if

16  that has occurred that I'm still entitled to know it.  And

17  it won't show up.  If that's true, it's not going to show

18  up on their reports.  So the second thing I ask is that

19  they inquire of each of the witnesses that they intend to

20  call, to see whether or not there is that kind of

21  conviction.

22             MR. SKURKA:  Any type of conviction

23  that is done away with by a pardon, Judge, I'm pretty sure

24  is not admissible anyway.  And I think that's in the rules

25  of evidence and the Court is probably aware of that.

1    Again, what that is trying to do, Judge, is going on a

2    fishing expedition.  The law says that I have to give him

3    stuff, and Brady material that is either exculpatory or

4    impeachable evidence in discovery.  Criminal records of

5    witnesses are not discoverable unless they have that type

6    of information.  If a person has a sheet, you know, and it

7    has 20 arrests that have not resulted in a conviction, he

8    can't use that and so he should not be able to get that

9    ahead of time on a fishing expedition.

10                    MR. TINKER:  That's --

11                    MR. SKURKA:  May I finish, Mr. Tinker?

12                    THE COURT:  Yes.

13                    MR. SKURKA:  The other thing I should

14    say, it is not proper, Judge, to have a clerk or one of

15    your staff -- not that I don't trust them or something

16    like that, but TCIC, NCIC, they're guarded pretty closely

17    by the DPS and you have to have a person that can be

18    accessed on to that machine like one of our investigators

19    or dispatcher or whoever, at the jail.  And TCIC, NCIC is

20    pretty complete.

21                    Now, if that shows up something he wants to

22    develop further I can understand that, too.  But, you

23    know, somebody who has been pardoned by parole -- I'm

24    sorry -- pardoned by the governor or something like that,

25    that is not going to be impeachable anyway.

1          Again, Judge, I'd ask the Court to follow the

2   procedure of me making the inquiry.  If he has specific

3   names -- and he has to have the specific request, which he

4   has -- specific names for me to run that history, give it

5   to you, and you give him only the thing that is

6   discoverable, which are those things that are impeachable.

7   And I don't even mind asking about if they have pending

8   charges, too.  I think that's probably --

9                    THE COURT:  Is that going to show up in

10  NCIC?

11                    MR. SKURKA:  Yes.  That's an

12  appropriate thing, Judge.  If there is somebody charged

13  with burglary in my office and I'm using them as a fact

14  witness against somebody else, that is the proper ground

15  for cross examination.

16                    THE COURT:  All right.

17                    MR. SKURKA:  And I think that's

18  correct, and I will give them anything that has pending

19  charges --

20                    THE COURT:  All right.

21                    MR. TINKER:  We're not asking Your

22  Honor, I'm not asking Your Honor to decide what is or is

23  not something that I can use.  I just want to know -- I

24  mean, if I am not told about a pending charge, then -- or

25  one that was dismissed recently -- and the Court will

XXXX XXXX XXXX XXXX

1    recall -- and it's not this prosecutor -- a case called

2    George Henley (phon.sp.) in which we were in your Court,

3    and they had -- the star witness in the case, they had

4    pending charges sitting over there, and they didn't reveal

5    it until about halfway through the trial.  And I'm just

6    saying, that's why I don't like to rely on the prosecutors

7    to make those kinds of decisions.  That's why I want Your

8    Honor to look at it.

9                But I think that that's a good way to start

10   it, and if that is not satisfactory, then I will reurge my

11   motion.

12                        THE COURT:  All right, I think so, too.

13                        MR. SKURKA:  So the Court's ruling is

14   that the --

15                        THE COURT:  I'm accepting your

16   proposal.

17                        MR. SKURKA:  Okay.  Thank you, Your

18   Honor.

19                        THE COURT:  So it's granted as revised

20   in the record.

21                Next?

22                        MR. TINKER:  Your Honor, I have a

23   motion here to produce and inspect the Grand Jury

24   transcripts.  I'm told that they have no transcript, but

25   as the Court recalls, I was attempting to ask the witness

```
 1   to the defense prior to trial.

 2               THE COURT:  Let me see that.

 3               MR. SKURKA:  There needs to be a

 4   clarification on that, Judge.  It wasn't

 5   actually provided to the defense.  What

 6   happened is, as the Court recalls, the pretrial

 7   motion hearing that we had, when they asked for

 8   information about criminal histories, I asked

 9   the Court to have an in camera inspection of

10   those --

11               THE COURT:  Yeah.

12               MR. SKURKA:  -- histories before

13   we do that.

14               THE COURT:  That's correct.

15               MR. SKURKA:  And I'd like the

16   record to reflect that the D.A.'s office took

17   all those records to the Court, who reviewed

18   them, at the time, before he was able to

19   determine whether any of them were admissible

20   to be turned over to the defense.

21          So that was not technically tendered

22   to the defense counsel.  It was tendered to the

23   Court in an in camera inspection.

24               MR. TINKER:  Well, that's the

25   one in October.
```

16

1          MR. SKURKA:  Yes, sir.  The

2     first one.

3          THE COURT:  But, for the record,

4     it does not show a "hit," to use the

5     vernacular.

6          MR. SKURKA:  That's correct,

7     Your Honor.

8          THE COURT:  All right.

9          MR. SKURKA:  We'll clarify that,

10    Your Honor.

11          THE COURT:  Proceed.

12          MR. MCGUIRE:  And then,

13    Defendant's Exhibit 6, for purposes of the

14    record, is the actual record of the Norma

15    Martinez who testified as a witness in this

16    case.  Whatever the date is.

17          MR. SKURKA:  I think it was

18    11/27.  It shows at the top right hand, Judge,

19    when it was actually run.

20    Q.   (By Mr. McGuire) After getting the

21    photograph of the witness from the sheriff's

22    department, did you conduct an investigation

23    through the public records of the county

24    clerk's office to see what you could find out

25    about the charges which Miss Martinez had been

1   records of witnesses, and also, motions

2   requesting discovery of any exculpatory

3   materials?

4   A.    There were.

5   Q.    And in response to those motions, were you

6   provided any records by the district attorney's

7   office indicating that Norma Martinez had a

8   criminal record?

9   A.    We were not.

10  Q.    Were you provided -- or were you able to

11  obtain from the sheriff's office,

12  independently, any criminal records of

13  Norma Martinez, either before trial or after

14  trial?

15  A.    Not before trial.

16  Q.    Okay.  They would not -- After trial, did

17  the sheriff's office give you criminal records,

18  or they just showed you --

19  A.    They verified the fact that warrants were

20  outstanding against her and I obtained a

21  picture, and, basically, that was it.

22  Q.    They would not give you a copy of the TCIC

23  or NCIC printout.

24  A.    They would not.

25                    MR. MCGUIRE:  Your Honor, the

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1   the police prior to the trial?

2   A.   I was.

3   Q.   You were provided a copy of that by the

4   district attorney's office?

5   A.   Yes, we were.

6   Q.   I'd like to ask you to examine this

7   statement and tell me if it is a true and

8   accurate copy of the statement that you were

9   provided by the district attorney's office

10   prior to trial.

11   A.   This is one of them, yes.

12              MR. MCGUIRE:  Okay.  Your Honor,

13   we'd offer this into evidence, for purposes of

14   this hearing.

15              MR. SKURKA:  We have no

16   objection.

17              MR. MCGUIRE:  I think this is

18   Defendant's Exhibit 3, I believe.

19              THE COURT:  Admit.

20              THE COURT REPORTER:  It's four.

21              THE COURT:  The Court admits the

22   document.

23   Q.   (By Mr. McGuire) Prior to the time of the

24   trial had the defense filed discovery motions

25   requesting the discovery of the criminal

1    So, essentially -- And y'all had both of those

2    statements before trial, correct?

3    A.    Yes.

4    Q.    And both of those statements revealed her

5    name to be Norma Maria Martinez, the way it is

6    printed on and she signed it, correct?

7    A.    That's what it -- that's how it's signed.

8                    MR. SKURKA:  I'll tender

9    State's Exhibit 1 to defense counsel and offer

10   it into evidence; that being the second

11   statement of Miss Martinez.

12                   MR. MCGUIRE:  We have no

13   objection.

14                   THE COURT:  Admit.

15                   MR. SKURKA:  That's all the

16   questions I have, then.

17                   THE COURT:  All right.  Anything

18   further of this witness on this?

19                   MR. MCGUIRE:  May we have just a

20   moment, Your Honor?

21           (Off-the-record discussion.)

22

23        R E D I R E C T   E X A M I N A T I O N

24   BY MR. MCGUIRE:

25   Q.    A capias is an order of a court to arrest

FORM CSR - LASER  REPORTERS PAPER & MFG. CO   800-626-6313

1   Q.  Do you know his last name?

2   A.  No, I don't.

3   Q.  But you know he is a maintenance man?

4   A.  Yes, sir.

5   Q.  Was he standing there near you or with you?

6   A.  He was standing there with me.

7   Q.  So Trinidad Martinez was standing, doing what?

8   A.  He was opening the door.

9   Q.  Was it right there in front of 128?

10   A.  Right.

11   Q.  And when they have two numbers in one of these

12  squares, all that means is that 128 would be

13  downstairs and 228 would be upstairs?

14   A.  Yes, sir.

15   Q.  So you were down at 128, and you had called to

16  get Mr. Espinoza to help you open the door there?

17   A.  Yes, sir.

18   Q.  Because he had a key and you didn't?

19   A.  Yes, sir.

20   Q.  And you were standing there side by side at the

21  time you hear this boom?

22   A.  Yes, sir.

23   Q.  I'm going to put Trinidad here.  "Was standing

24  there at the time of boom."

25            Now, did you see what he did at the

(C) S.Oballe 1995 -- All Rights Reserved

```
 1   it's in between right here because I was running.

 2   Selena was going through here, through here.

 3   Q.  Okay.

 4   A.  You see, and Selena ran.

 5   Q.  Along in here?

 6   A.  Right.  Through the street, through the street,

 7   and Selena ran right here.

 8   Q.  If you move just a little back so everybody can

 9   see.

10   A.  I'm sorry.

11   Q.  And could you hear the screams of Selena?

12   A.  Yes.

13   Q.  Could you hear anything that was said over here

14   by the defendant?

15   A.  She just yelled and told her, "bitch."

16   Q.  While she was standing here?

17   A.  Right.

18   Q.  Was that after she put the gun down?

19   A.  Right.

20   Q.  She called her "bitch"?

21   A.  Yes, sir.

22   Q.  You heard her say that?

23   A.  Yes, sir.

24   Q.  After she said, "bitch," what did she do?

25   A.  She just put the gun down, and she turned
```

1358

(C) S.Oballe 1995 -- All Rights Reserved

1 to that.

2          THE COURT:  That's not permitted,

3 Counsel.  Overruled.

4 Q.  (By Mr. Valdez)  Are there things that you're

5 telling the jury now that are not in your

6 statement?

7 A.  The only thing I didn't put in the statement

8 was the word that I heard her scream at Selena.

9 Q.  And that was "bitch"?

10 A.  Yes.

11 Q.  But you told the police that?

12 A.  I didn't tell the officer, but I told the other

13 officer because I didn't know if I told him or not.

14 Q.  Which officer did you tell?

15 A.  Rivera.

16 Q.  Paul Rivera?

17 A.  Yeah, I think, or Ray.

18 Q.  Ray Rivera.  And you said you told that

19 officer, but you didn't tell another officer?

20 A.  No, sir.  Because I did not know if I could --

21 you know, since they were older than me, I respect

22 people.

23 Q.  Because they were older than you?

24 A.  Yes, sir.  And that word, to me, it's, you

25 know, a lot.

1365

(C) S.Oballe 1995 -- All Rights Reserved.

1    A.   No, sir.   The only officer I talked to was a

2    white man, and he just told me for me not to move

3    from the lobby because they are going to take me to

4    the police department.

5    Q.   You don't remember talking -- telling an

6    Officer Geron that you did not see the shooting?

7    A.   No, sir.

8    Q.   You deny that you told Officer Geron that?

9    A.   I never told nobody like that.

10   Q.   Never told any officer that?

11   A.   No, sir.   No.

12   Q.   Now --

13                MR. VALDEZ:   Your Honor, I'm going to

14   object to any further writing on the diagram.   The

15   court reporter is making a transcript of the

16   proceedings here, and what Mr. Tinker is doing is

17   he's writing down some parts of the testimony for

18   the jury to take into the deliberation.   And the

19   proper thing to do is to read the court reporter's

20   notes if they have any question about it.   So I'm

21   going to object to his writing on the diagram, any

22   further writing.   What he's doing --

23                THE COURT:   Excuse me, Counsel.   I

24   can't see what's going on.

25                MR. TINKER:   I wrote "never," "any,"

1372

(C) S.Oballe 1995 -- All Rights Reserved

1    Q.   And did you see Yolanda Saldivar fire a shot

2    out here at Selena Quintanilla Perez after she was

3    outside?

4    A.   No, sir.

5    Q.   May I -- and you can sit down for this part.

6    A.   (Witness complies.)

7    Q.   Counsel talked to you some about where there

8    are differences in your testimony today and what

9    you may have testified -- I mean, what may be in

10   your statement that you gave on the 31st of March.

11   Do you remember the prosecutor asking you that?

12   A.   Yes, sir.

13   Q.   Let me show you your statement that you gave,

14   and you said that the only thing that you thought

15   was different was where you had left out "you

16   bitch"?

17   A.   Yes, sir.

18   Q.   Now, let me ask you.  As she was chasing

19   Selena, she pointed the gun --

20                  MR. VALDEZ:  Your Honor --

21                  Excuse me.

22                  I object to any reading of the

23   statement.  I object to any reading of the

24   statement unless it's introduced into evidence.

25                  THE COURT:  Overruled.

1381

(C) S.Oballe 1995 -- All Rights Reserved.

1  A.  At the motel.

2  Q.  But do you remember Mr. Rivera coming out and

3  talking to you again?

4  A.  Yes, sir.

5  Q.  You -- I have these two statements.  The first

6  one -- I've got them, both of the statements.  When

7  the officer came out and talked to you, the one who

8  talked to you on the 11th of April, he was one of

9  the detectives, investigators.  Do you remember

10  that?

11  A.  Yes, sir.

12  Q.  Did you know him before these events?

13  A.  No, sir.

14  Q.  And he talked to you some more and asked you

15  some more questions about what you saw, what you

16  did out there, didn't he?

17  A.  Yes, sir.

18  Q.  And on that date you never mentioned once what

19  you now say Yolanda Saldivar said, "you bitch" did

20  you?

21  A.  No, sir.

22  Q.  You didn't tell him that at all?

23  A.  No, sir.

24  Q.  Now, did you actually see Yolanda go to her

25  pickup or run to her pickup, get in her pickup, and

1389

(C) S.Oballe 1995 -- All Rights Reserved

(REC. EX. #11)

```
 1   where these two buildings meet, right at the
 2   corner.  It's under -- on the bottom floor, first
 3   floor.
 4   Q.  Were you on the first floor or the second
 5   floor?
 6   A.  First floor.
 7   Q.  Okay.  And you told the jury that you heard
 8   something?
 9   A.  Yes, sir.
10   Q.  What did you hear?
11   A.  I heard a loud boom.  At first I thought it
12   was, like, a flat tire on a truck or something, so
13   I walked --
14   Q.  What did you do when you heard the boom?
15   A.  I walked towards the corner here and looked
16   towards this way.
17   Q.  And when you looked that way, what did you see?
18   A.  I saw a girl running, from about here, running
19   across this way.
20   Q.  What did the girl look like, Mr. Espinoza?
21   A.  It was a young girl, wearing, like, a jogging
22   suit, light green.
23   Q.  What was she doing?
24   A.  She was running and screaming.
25   Q.  Could you hear what she was screaming?
```

1304

(C) S.Oballe 1995 -- All Rights Reserved

1  A.  No.  I could only hear screams.

2  Q.  You couldn't make out if she was saying

3  anything?

4  A.  No.  No words.

5  Q.  If you will, wait until I finish asking my

6  questions.

7          THE COURT:  Okay.  Counsel, maybe I

8  should address him.

9          Mr. Espinoza.

10          THE WITNESS: Yes, sir.

11          THE COURT:  It's very important

12  because this lady here is a taking down everything

13  you're saying.

14          THE WITNESS:  I'm sorry, Your Honor.

15          THE COURT:  And she can't take two

16  people at one time, so that's why it's very

17  important.

18          THE WITNESS:  Yes, sir.

19          MR. TINKER:  Your Honor, I have a

20  question.  Could he pull that mike forward?

21          THE COURT:  Good idea.

22  Q.  (By Mr. Valdez)  What was the young girl

23  wearing?

24  A.  She was wearing a kind of a -- like a jogging

25  suit.

1305

(C) S.Oballe 1995 -- All Rights Reserved

1    Q.    Did you act on that information?

2    A.    Yes, I did.  The people that gave me the

3    information also told me that there had been an

4    interview there locally of KORO of an elderly

5    lady that had alleged that her social security

6    checks had been stolen by Norma and cashed, and

7    the money never given to her and that charges

8    had been filed, so I proceeded to try to find

9    out if any charges had been filed against

10   Norma.  And, at the same time, I talked to

11   Raul, our investigator, and he went in one

12   direction, then I went to the sheriff's

13   department to find out if there was any

14   outstanding warrants and if there was any

15   records on Norma.

16   Q.    When you asked them to search to see if

17   there were records or warrants, what

18   information did you give the sheriff's

19   department?

20   A.    The name Norma Martinez and her birth

21   date.  They told me that the birth date is how

22   they could track it down, in regards to any --

23   any files in -- in their computer.

24   Q.    Did you identify her either as Norma Marie

25   Martinez or Marie Norma Martinez?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    A.    It was Norma Martinez.

2    Q.    And with the name Norma Martinez and the

3    date of birth, they were able to come up with a

4    record on the individual?

5    A.    They did.  They informed me, one, that

6    there was an outstanding warrant for her, and

7    that it was -- basically, that there was a

8    warrant out for her and if I knew where she --

9    where she was.

10   Q.    Did they -- was there, also, a -- yeah,

11   what was the warrant for?

12   A.    It was for violation of her probation --

13   or revocation of her probation.

14   Q.    Were you provided a photograph of Norma

15   Martinez by the sheriff's department?

16   A.    I was.

17   Q.    And did you recognize the person in that

18   photograph as being the same person who had

19   testified in this court as Norma Marie

20   Martinez?

21   A.    Well, first, it was hard, but then the

22   birth -- it is the same person, and, of course,

23   the same birth date.

24   Q.    You are -- Did -- Were you familiar with

25   the statement that Miss Martinez had given to

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

0000 0000 3813 2747

1    tape that -- of the elderly lady, so that I

2    could find out who the elderly lady was,

3    hopefully, that I could go talk to her, okay?

4    Q.   I understand.

5    A.   And when they were not able to provide me

6    with the tape, or, at least, they told me that

7    they had already turned in everything they had

8    in regards during pretrial, and the Court had

9    them, I, then, went to the sheriff's office.

10    Q.   When you went to the sheriff's office, you

11    said that -- you gave them what name?

12    A.   Norma Martinez.

13    Q.   And that date of birth of Norma Martinez?

14    A.   The date of birth is what they asked me

15    for --

16    Q.   Did you --

17    A.   -- primarily.

18    Q.   Did you ask them to check any other like

19    names or similar names to Norma Martinez?

20    A.   No.  I think that he did ask me, you know,

21    about where I got the birth date, and I told

22    him from the state-- in the statement, and I

23    gave him whatever the name was in the

24    statement.

25    Q.   And it's your testimony that when you went

1    A.    Right.  Release of this information is

2    illegal, if it's not made for law enforcement

3    purposes.

4    Q.    Defense Exhibit No. 5, is it?  When --

5    Does it show when this record was run?

6    A.    Yes, it does.

7    Q.    When was it run?

8    A.    It was run on October 2, 1995, at 12:40

9    p.m.

10   Q.    And would it be fair to say that that was,

11   what, one week before the trial began, since

12   the trial was scheduled to begin October 9th?

13   A.    That's exactly a week before.

14   Q.    And what is the name on that run?

15   A.    Norma Marie Martinez.

16   Q.    And --

17                THE COURT:  Excuse me.  Is there

18   a date of birth on that?

19                THE WITNESS:  Yes, sir, it's

20   1/4/54.

21   Q.    (By Mr. Skurka) Does that date of birth

22   correspond with what was given on the two

23   statements?

24   A.    Yes, it does.  Well, on Defense Exhibit

25   No. 4.

1    A.    Yes.

2    Q.    -- Norma Marie Martinez?   And you

3    testified that you wrote the name Maria Norma

4    Martinez on the photograph and on the -- well,

5    it's on the complaint itself, correct?

6    A.    When I wrote that down, I think, it's

7    because he told me that that's what the warrant

8    showed.

9    Q.    Okay.  And you've, also, indicated a --

10   the criminal docket sheet in Cause No.

11   90-5360-3.  Is it true that that doesn't show

12   a conviction of anything on Maria Norma

13   Martinez?

14   A.    You know, I cain't really read that.   I

15   can say that it was reset on a plea, '91 --

16   1/30/91; and a plea on 2/26/91.

17   Q.    But it doesn't show -- that docket sheet

18   doesn't show that she ever pled guilty or was

19   convicted of that case, correct, from the

20   records that were introduced?

21   A.    It shows that a capias was issued or a

22   warrant was issued.

23   Q.    And my question, again, Mr. Garcia:  Does

24   that record that you have in your hand show

25   that she was convicted of theft?

1    A.    No, it does not.

2    Q.    You, also, said -- and you said that when

3    you went to look in the Warrants Department, or

4    Warrants, you said that's the one that had the

5    warrant for the revocation of probation.  Was

6    it off of that case?

7    A.    I don't know.  He's the one that told me.

8    He would not give me the documents.  He just

9    told me that there was a warrant and wanted to

10   know if I knew where she was at.

11   Q.    Okay.  But it's, also, your testimony

12   that the sheriff's office did not indicate --

13   did not indicate to you -- would not give you

14   the copy of the TCI-, NCIC, correct?

15   A.    Would not.

16   Q.    Would not do that.  They are prohibited

17   from doing that?

18   A.    I don't know.  I think, basically, some

19   other department had it.

20   Q.    Well, let me show you the corollary -- I

21   think, there's some additional information in 7

22   that's now contained in state's -- I'm sorry --

23   Defense Exhibit 8.  And that, also, shows the

24   same case, does it not?  Just look at the cause

25   numbers.

1    A.    (Witness complies.)

2    Q.    Is that the same cause number that's shown

3    in State's Exhibit 8 -- Defense Exhibit 8?

4    A.    Yes.

5    Q.    Is that right?  Now, we've talked about

6    Defense Exhibit No. 7 not showing she was

7    convicted of theft, correct?  You testified to

8    that, correct?

9    A.    Yes.

10    Q.    Okay.  Now, look at Defense Exhibit 8.

11    Does that, now, show the same docket sheet,

12    with some more entries added to it?

13    A.    Yes, it does.

14    Q.    Okay.  And does it, also, show that Maria

15    Norma Martinez was -- something happened to her

16    on that case.  What happened on it?

17    A.    Wait a minute, wait a minute.  "Reassigned

18    to Court No. 1."

19    Q.    Okay.  That means it was transferred to

20    another county court, right?

21    A.    Okay.

22    Q.    Well, let me just -- Okay.  What's the

23    next entry?

24    A.    "12/4/95, transfer order to" --

25    Q.    Okay.  That's a transfer order to another

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313