1    court?

2    A.    It says, "No. 3."

3    Q.    Okay.  That's County Court at Law No. 3.

4    A.    Well, that's where it was originally

5    filed.

6    Q.    Well, I don't know.  They have a one, and

7    three scratched out, I think.

8    A.    We have three on ours.

9    Q.    Okay.  But did it, also, show what

10   happened in this case on 12/15/95?

11   A.    It says, "The defendant entered a plea of

12   guilty."

13   Q.    Okay.  On what date, again?

14   A.    12/15/95.

15   Q.    And I refer you to another thing in the

16   body of Defense Exhibit 8 that shows the

17   judgment and sentence.  You're aware of what

18   that is, right?  What does that show?

19   A.    15th of December.

20   Q.    The 15th of December?

21   A.    '95.

22   Q.    Okay.

23   A.    Where she pled guilty.

24   Q.    Pled guilty and, basically, received 45

25   days on the Spurs program, correct?

1    somebody who has failed to appear for court; is

2    that not correct?

3    A.    That's correct.

4    Q.    And the docket sheet that's been

5    introduced in Cause No. 90-5360 indicates that

6    a capias was issued in 1990 for Miss Martinez.

7    A.    That's correct.

8    Q.    In other words, that indicates that a case

9    was pending, she had failed, for whatever

10   reason, to appear for court and there was a

11   warrant outstanding for her.

12   A.    In '91.

13   Q.    In December of -- and it remained on the

14   suspense file until December of '95.

15   A.    Correct.

16   Q.    And that was part of the reason for the

17   arrest warrant being in effect at the time that

18   you discovered the picture at the Warrants

19   Department; is that correct?

20   A.    That's correct.

21                MR. MCGUIRE:  Pass.

22                THE COURT:  All right.

23                MR. SKURKA:  I don't have any

24   other questions.

25                THE COURT:  Then, call your next

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    A.    Yes, sir, 14:55 is --

2    Q.    Almost three o'clock, I think.

3    A.    Yeah, almost -- 2:55 p.m.  It was on the

4    27th, the day we received the motion for new

5    trial.

6    Q.    Before you saw that criminal history did

7    you have any idea whether or not this lady had

8    a criminal history?

9    A.    No, sir.

10   Q.    And the only reason you investigated it

11   was because of the allegations the defense made

12   in their motion; is that correct?

13   A.    That's right.

14   Q.    Had she ever told you that she was on

15   probation?

16   A.    No, sir, she hadn't.

17   Q.    Never said anything about that.  And, in

18   fact, does that record not show that she had

19   been convicted of a Class A Theft and there was

20   another Class A Theft pending; is that correct?

21   A.    That's what it shows.

22   Q.    And I think the records up there show that

23   was for some type of food stamp violation or

24   something like that, according to the

25   complaint?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    Q.   Okay.  And the -- the amount -- Well,

2    let's see.  Do you know how much -- It was

3    about $2200 worth of food stamps that you got

4    that way; is that right?

5    A.   No, sir.

6    Q.   2200?

7    A.   Well, recently, that I went to a hearing,

8    it was about two -- two sixty-five.  I cain't

9    remember.  Well, mostly it was -- Well, yeah,

10   it was two sixty-five, I think.  I cain't

11   remember exactly.

12   Q.   Now, did you, also, take some money from

13   the AFDC, in addition to food stamps?

14   A.   That's including.  No, not -- not -- It

15   was not AFDC.

16   Q.   Let me show you Defendant's Exhibit 9,

17   back from 1990.  Doesn't this indicate that

18   you took $1,264 in AFDC money, plus $960 in

19   food stamps?  Can you see where I'm pointing at

20   there?

21   A.   Oh, okay, yeah.

22   Q.   Isn't that what that says?

23   A.   Yes, sir.

24   Q.   Okay.  And so, we're dealing with both

25   AFDC funds -- How do you get the AFDC funds?

```
 1    if she wanted to talk to you and she said she

 2    doesn't want to talk to you.  I'm just

 3    communicating that to the Court.

 4                    MR. TINKER:  It's an effort by

 5    Mr. Quintanilla's lawyer to prevent this

 6    witness --

 7                    THE COURT:  Okay.

 8                    MR. TINKER:  -- from talking to

 9    the defense and I object to that.

10                    THE COURT:  I will ask that you

11    stay around this afternoon.

12                    MR. VALDEZ:  Your Honor, can --

13    can we make it clear on the record.  She's not

14    required to talk to Mr. Tinker and you never

15    said that she could talk to --

16                    MR. TINKER:  Just tell her --

17                    THE COURT:  You can talk to

18    anyone you want to, if you want to.

19                    MR. VALDEZ:  But she's not

20    required --

21                    THE COURT:  If you don't want

22    to, then, there may be other legal proceedings

23    where they can force you to talk to them, but

24    you don't have to on your own.

25                    THE WITNESS:  Okay.
```

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1   evident from all the testimony that has been presented,

2   that there has not been any violation of 38.22.  All of

3   the requirements of 38.22 have been met.  There is no

4   indication of any coercion, force being used in obtaining

5   the written statement.  There may be some inconsistencies

6   in the testimony, Judge.  It's our position that those

7   inconsistencies will go to the weight of the statement and

8   not to the admissibility, and so we ask the Court to deny

9   Defendant's Motion to Suppress the Written Statement.

10                  MR. TINKER:  Your Honor, they have the

11  burden and it's my position that they have not met that

12  burden.

13                  I have no further argument.

14                  THE COURT:  All right.  I have examined

15  the document and do not believe that it should be

16  suppressed, so it is so ordered.

17                  I guess we'll see you all tomorrow.  Do we

18  have other matters?

19                  MR. TINKER:  Your Honor, I would like

20  to take up the matter of the photograph, and --

21                  THE COURT:  Yes.

22                  MR. TINKER:  If you don't mind.

23                  For the record, it was my request in the

24  presence of counsel that my client be permitted to have a

25  photograph taken, because the photographs that are being

1    A.   About two and a half pages.

2    Q.   And if you see that statement today, do you

3    think you would be able to recognize it?

4    A.   Yes, sir.

5    Q.   Sergeant, I'll show you States Exhibit No. 37.

6    Do you recognize that?

7    A.   Yes, sir, I do, sir.

8    Q.   What is it?

9    A.   It's a statement given by Yolanda Saldivar.

10   Q.   Is that the statement that we've been talking

11   about this morning?

12   A.   That's correct.

13   Q.   And that was the statement that she gave to

14   you-all?

15   A.   That's right.

16   Q.   And is her signature -- does her signature

17   appear at the bottom of each one of those pages?

18   A.   Yes, sir.

19   Q.   Is that required?

20   A.   Yes, sir.

21            MR. VALDEZ:  Your Honor, I offer

22   State's Exhibit No. 37.  I'm going to staple them

23   together.  Tender it to Defense Counsel.

24            MR. TINKER:  Your Honor, we renew

25   those objections that were made before concerning

2162

(C) S.Oballe 1995 -- All Rights Reserved

1  this document.

2                  THE COURT:  Overruled.  Admitted.

3  Q.  (By Mr. Valdez)  Sergeant, is this the original

4  statement that was given?

5  A.  Yes, sir.

6  Q.  I know you've seen copies before, but is this

7  the original?

8  A.  Yes, sir, it's the original.  Normally on my

9  original statements I use a blue pen.

10  Q.  Why do you use that blue pen?

11  A.  To distinguish the original from the copies.

12  Q.  Sergeant, I'm going to ask you to read that

13  statement to the jury.  Starting at the top,

14  explain to the jury what it says at the top and the

15  box that includes the rights that were read to her

16  again, and then I'm going to ask you to read the

17  statement.

18                  THE COURT:  Why don't we take a

19  break?

20                  Members of the jury, we'll be in

21  recess.

22                  (Recess -- 9:45 - 10:05 a.m.)

23                  THE COURT:  Please be seated.

24                  We ready for the jury?

25                  Bring in the jury.

2163

(C) S.Oballe 1995 -- All Rights Reserved

1  brothers and sisters she had?

2  A.  I don't recall the exact number.

3  Q.  Did you ever promise her that she would get a

4  lawyer?

5  A.  Yes, I did.

6  Q.  How did that happen?

7  A.  Again, she needed to have a hope to talk to

8  somebody else, and in this particular case there

9  was a name that had come up, that, again, he

10  claimed to be an attorney that had done business

11  for the family.  But on the other hand he was kind

12  of lukewarm about he really wasn't her attorney,

13  but he was her friend, and, so, "Use my name, but,

14  no, don't use my name.  Just say an attorney says

15  this," and that's where I got her pet name that

16  Selena would refer to her as Buffy came from this

17  attorney, Richard Garza, I believe.

18  Q.  And he identified himself as a family lawyer or

19  her lawyer or how?

20  A.  That he had done business for the family, but

21  he never said specifically her lawyer, that he had

22  done business for the family, and, of course, he

23  was very apprehensive talking with me.  But on the

24  other hand, I stressed to him that I was not

25  conducting the criminal investigation, I was only

2054

(C) S.Oballe 1995 -- All Rights Reserved

1  attempting to gather information, personal

2  information, I could use to build rapport, whether

3  with me or Larry Young with her.  So this is where

4  he finally broke down and told me, "Well, I know

5  the pet name that Selena would call her is Buffy,

6  and tell her Selena doesn't want Buffy to hurt

7  herself, and that don't use my name, but say her

8  attorney says that to come on out and I'll help

9  you," and that type of stuff.

10  Q.  Did he ever, ever, tell you that he was

11  representing her?

12  A.  No.

13  Q.  After the situation ended when she was taken

14  into custody, did you get her a lawyer?

15  A.  No.

16  Q.  Why not?

17  A.  Again, my responsibility, my role on the scene

18  was hostage negotiator and beyond that that's not

19  my prerogative nor my responsibility.  My

20  responsibility ended with the successful surrender

21  of the offender, and then beyond that of course the

22  regrouping of our equipment and quick debriefing.

23  By then we were all exhausted and so it was good

24  enough to get our equipment picked up.

25  Q.  Where was she turned over to after the hostage

(C) S.Oballe 1995 -- All Rights Reserved

1  negotiation team had successfully gotten her out of

2  truck?

3  A.  From what I recall or remember she was removed

4  from the scene by a patrol car, and in the patrol

5  car I believe it was staffed with three SWAT Team

6  members.  It was going to be four, but the

7  lieutenant on the unit, on the scene, the SWAT Team

8  on the scene wanted Larry Young in the vehicle with

9  her to facilitate her.  She was also very exhausted

10  and very weak, obviously, and he felt that it would

11  be better to have Larry Young in there with her and

12  that would help calm her down and facilitate the

13  transport to the station.

14  Q.  Did Larry Young go with her then?

15  A.  Yes.

16  Q.  After the hostage negotiation team or SWAT

17  takes over or after they take the person, who do

18  they then turn it over to?

19  A.  It can be one or two ways.  It can be a direct

20  booking into the county jail, it can be a direct

21  transfer to the criminal investigation division, it

22  can vary.  In this circumstance it was transferred

23  to the criminal investigation division for safety

24  purposes.

25  Q.  And what's the procedure they do when they turn

2056

(C) S.Oballe 1995 -- All Rights Reserved

```
 1   can be used or appellate court can, in some

 2   intelligent way, decide whether there was

 3   something in those mental health records, the

 4   treatment records, that should have been --

 5   could have been beneficial to the accused in

 6   her defense, and that they should have been

 7   turned over.  But absent your attaching those,

 8   at least, to the record, even if you don't look

 9   at them, we have no -- no way of demonstrating

10   that.

11              THE COURT:  Yeah, I understand,

12   but I'm satisfied that the statement --

13   Actually, I'm fairly satisfied that the

14   statement is really, basically, all that

15   happened.  There's one -- one encounter.  And

16   there may be some dispute about that, but...

17              All right.  The other matter, of

18   course, kind of touches on what we're doing

19   here, today.  But I did have a brief meeting

20   with the -- I forget his name.

21              MR. VALDEZ:  Joel Casteneda.

22              THE COURT:  I know his name.  I

23   just forgot his rank.

24              MR. VALDEZ:  Sergeant.

25              THE COURT:  Sergeant.  He ought
```

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1   to be more than a sergeant.  Sergeant

2   Casteneda.  I did talk to him, and I also

3   compared what he had to what I had and I

4   asked -- requested that he simply copy

5   everything that he had and make it available

6   and for in camera -- actually, I've actually

7   inspected it.  I just want it in the record.

8   So I'll probably need an order on that, too.

9                MR. TINKER:  And that's with

10  regard to the documents which would either

11  prove or disprove the allegation of theft, Your

12  Honor, is that what...

13               THE COURT:  I guess, that would

14  be an adequate description, yeah.

15               MR. TINKER:  I take it, again,

16  that you're not gonna turn those over to me,

17  Your Honor, is that what you --

18               THE COURT:  Not at this time.  I

19  may turn over some of what I already have.  I

20  really haven't decided, yet.

21               MR. TINKER:  Well, here's --

22  here's the problem.  They --

23               THE COURT:  Excuse me.  The

24  Judge wants to confer with me.

25                  (Off the record.)

0000 0000 3813 3710

1          THE COURT:  Well, you've

2    produced the witness, so I assume that you

3    knew -- or had some idea what the Court had

4    done.

5          MR. TINKER:  Was that the

6    witness, the witness that Your Honor talked to

7    ex parte?

8          THE COURT:  Yeah.

9          MR. TINKER:  I'm not objecting

10   to it, but my next question is:  Was there a

11   record made?

12         THE COURT:  No, there wasn't.

13   But it was a review of his file.

14         MR. TINKER:  And that's all it

15   was.

16         THE COURT:  Yeah.

17         MR. TINKER:  It wasn't taking

18   testimony from him or anything.

19         THE COURT:  No.

20         MR. VALDEZ:  And it wasn't with

21   the state being present.

22         THE COURT:  Oh, absolutely not,

23   no, of course not.  But I assume that, since

24   you had produced him, that you knew that I --

25   what I'd done.

```
 1              MR. VALDEZ:  Yes, I figured that
 2   that's what the Court had done.
 3              THE COURT:  All right.  So I
 4   need an order on that.  So, I guess, there's
 5   three orders, depending on how you count them.
 6          And as I've already indicated, last
 7   time we had something come up about a
 8   document, and I forget the context, but it came
 9   up that there was some question about it, so --
10   that is, in all this -- these two boxes that I
11   have from the Quintanilla interests, and
12   somehow or another some interchange came up
13   about a document.  And I intend to turn that
14   dock-- it's actually a document -- over to Mr.
15   Tinker.  But it was after review of the entire
16   two boxes that I saw it and I might not find it
17   that easily.
18              MR. TINKER:  For the record, I'd
19   just suggest that I could assist the Court in
20   that regard.
21              THE COURT:  Yeah, I'm sure you
22   would, but, no thank you.  I'll have to decline
23   your kind offer.
24          But it will take -- I guess, it will
25   take me almost as long -- well, no, it wouldn't
```

FORM CSR - LASER  REPORTERS PAPER & MFG  CO   800-626-6313

1   take as long, but I should be able to locate

2   that.  And when I do, since I'm actually

3   turning something over, I will provide both

4   sides with a copy.

5              MR. TINKER:  Let me make one

6   other announcement with regard to the records

7   concerning the allegation of embezzlement that

8   Your Honor's gonna look at in camera.  I assume

9   that means that you have not decided whether I

10  do or do not receive that.  Am I correct?

11             THE COURT:  Well, I'm leaning

12  towards giving you a portion of it.

13             MR. TINKER:  I just -- I just

14  want to encourage the Court.  I am doing -- I'm

15  gonna do my best to be ready to go to trial on

16  the 9th of October.  I plan that, and have been

17  making arrangements where I'm gonna stay, and

18  those kind of things, as the Court knows.  But

19  if they have taken this long to invest that

20  allegation, if they're saying they're just now

21  getting through with it --

22             THE COURT:  Well, I think, we're

23  really getting into the motion.  Why don't we

24  just hear the motion.  I'm gonna call the

25  motion that's set for --

0000 0000 3813 2715

1          MR. TINKER:  Let me finish

2    making a statement with regards to discovery of

3    the records, first --

4          THE COURT:  Okay.

5          MR. TINKER:  -- whether or not

6    it's presented to the grand jury, if you don't

7    mind, Your Honor.

8          THE COURT:  Yes.

9          MR. TINKER:  And it is my

10   intention, if I am not -- if I don't have

11   time, I just wanna sound the alarm, to -- to

12   look at these records, at whatever time I

13   finally get them, it is my intention to -- if

14   I'm not ready for trial I intend to say so in a

15   motion for continuance.  And this -- this --

16   what's happening, now, is -- and Your Honor is

17   taking the time -- I'm just encouraging the

18   Court to do what -- if you're gonna give it to

19   me, I request you do so before the end of the

20   week, so I can have some opportunity to have --

21   to start investigating that allegation.

22         THE COURT:  Well, I'll try to do

23   that, counsel, but, you know, unfortunately,

24   this is not the only case that the Court's

25   dealing with.

1          MR. TINKER:  I know that, Your

2     Honor, and that's not the only one I've got,

3     either.

4          But, in any event, I'm ready to go

5     forward on the motion.

6          THE COURT:  Well, we'll make an

7     effort to see what we can provide you.  But,

8     you know, I'm gonna get some guidance from this

9     motion, I assume.

10          MR. TINKER:  Well, --

11          THE COURT:  So why don't you

12     proceed with your motion.

13          MR. TINKER:  Your Honor, the

14     motion, you know, it really speaks for itself.

15     I've said the way I feel about it in the

16     motion.  I rely on the words in there.  It is

17     my view that the -- that it's more than a

18     coincidence that they -- and I learned, as a

19     matter of fact -- I didn't even read it in the

20     San Antonio paper -- that somebody told me the

21     San Antonio paper reported that the

22     prosecution, that this county, was gonna indict

23     my client before the start of the trial and

24     that they had concluded a theft or embezzlement

25     investigation.  And I think it's more than a

1  coincidence and that that's gonna occur.  I

2  called to talk to Mr. Skurka just to asked him,

3  "Look why don't we wait, so it doesn't cause

4  any delay, as far as this trial is concerned."

5  He would not deny -- he would not admit,

6  either, that they were gonna present it, nor

7  would he deny it.  And that's what I say in the

8  motion.  It's a tactical thing, in my view, and

9  I say that in my motion.

10            So I request a response from counsel.

11            THE COURT:  Okay.  Response?

12            MR. VALDEZ:  Your Honor, first

13  of all, Mr. Tinker can't get up here and say

14  he's surprised by all this.  He's known since,

15  probably, April that this was coming.

16            MR. TINKER:  I've known Mr.

17  Valdez --

18            THE COURT:  Excuse me.  You're

19  out of order.

20            MR. VALDEZ:  And he can't stand

21  up here and say he's surprised by the fact that

22  this may be going to the grand jury.  He says

23  that he heard about the fact that it may be

24  going anytime soon and that Mr. Skurka did not

25  admit or deny.  There's a reason for that,

1  Judge. We're still not sure when it's going to

2  grand jury. I don't think Mr. --

3  Sgt. Casteneda's through with his

4  investigation. As of last week when I spoke to

5  him, there was a couple of more witnesses that

6  we asked that he take statements from. As soon

7  as those witnesses -- their statements are

8  taken, we intend to sit down with him and look

9  at it and see if it's ready for a grand jury

10  presentation. At that time it will be

11  presented to the grand jury. It may very well

12  be before trial. It could be by Thursday. If

13  the Court asks us to move along and do

14  something by Thursday, I'll drop everything

15  else I'm doing, Judge.

16         This is not the only case our office

17  is handling. This is not the only thing we're

18  involved in. There's a whole bunch of other

19  things that we're involved in, at the present

20  time, that we're working on. But, if the Court

21  says that -- orders me to work on it, we'll try

22  to get it done by Thursday. And it's still

23  possible, Judge, that, even if she gets did

24  indicted, the matters that she may be indicted

25  for may not be relevant to the -- to the trial

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    of this case.  Of course, that all depends on

2    Mr. Tinker.  Mr. Tinker will make anything he

3    wants relevant to the case, and he'll probably

4    wanna make this relevant.  And, if he does, he

5    may be entitled to discovery in that case,

6    also.

7           He -- he complains, now, about

8    something he's been complaining about for the

9    past couple of hearings, and that's, he's been

10   wanting to be make the theft case part of the

11   murder case.  He's been complaining about that,

12   saying that it should be part of the murder

13   case.  It should be part of the murder case.

14   Here's a chance that it may become part of the

15   murder case, now, he's complaining about that.

16   I don't know if anybody else sees that.  But he

17   shouldn't be able to get up here and argue

18   before the Court saying, "We're surprised by

19   this."  That's not exactly what his motion

20   says.  His motion, really, is -- is in the form

21   of a mandamus, ordering -- asking the Court to

22   order us not to present it to the grand jury.

23   He knows, from his extensive experience in --

24   in the law, that there's no authority for the

25   Court to order us not to present it to the

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1  grand jury.

2          Now, he couches it like this, so that

3  he can ask for what he's really asking for, and

4  that's for a motion for continuance.  I don't

5  think he wants to go to trial on October 9th.

6  I think he's asking for this -- couching it in

7  these words, so that he blames us for the

8  continuance.

9          We're willing to do this, Judge, and

10 we're ready to do this, sit down with

11 Sgt. Casteneda, see if everything is ready and,

12 if necessary, present it to the grand jury on

13 Thursday, give whatever the Court deems is

14 necessary to the Court and whatever you think

15 is -- should be turned over to the defense, you

16 can turn it over to the defense.  We wouldn't

17 have any objection to that.  But that's where

18 we are right now.

19          THE COURT:  Let me ask you a

20 ques-- Have you concluded?

21          MR. VALDEZ:  That's fine.

22          THE COURT:  Let me ask you a

23 question:  Do you wanna go to trial on the 9th?

24          MR. VALDEZ:  We're ready to go

25 to trial tomorrow.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

```
 1                    THE COURT:  Okay.  Have you
 2    assessed the possibility of the complica-- I
 3    mean, it's totally your discretion --
 4                    MR. VALDEZ:  Yes, sir.
 5                    THE COURT:  -- as the Court
 6    understands.  And I haven't heard the closing
 7    comment, but I brought up the case of
 8    Dimbrowsky.  You know, Dimbrowsky's the only
 9    case I've ever heard of where an injunction is
10    permissible, and that -- you know, I don't
11    think you've made the allegations come within
12    that case.
13                    MR. TINKER:  For the record,
14    you're directing that response to me?
15                    THE COURT:  Yeah.
16                    MR. TINKER:  Your Honor, I,
17    frankly, don't believe that Your Honor has the
18    authority to order them not to present
19    something to the grand jury, at least, not
20    this.  There are some cases just recently out
21    of Lubbock, Texas -- Amarillo, rather, where
22    Miller Farmer was -- they were trying to indict
23    him and it was stopped -- actually, it was a
24    petition in the federal court, but it was a
25    state court proceeding.  But I don't -- I don't
```

1    suggest you have the power to do so.  What I do

2    suggest is, Your Honor, that you have the --

3    the -- as a matter of fact, I do believe you

4    have the power, if, in some way, it affects

5    your jurisdiction as far as the trial of this

6    homicide allegation is concerned, but, what I

7    would hope, by this hearing, is that Your Honor

8    would make suggestions to the prosecution

9    concerning their effort -- this effort on their

10   part, as I've alleged in the indictment (sic)

11   and counsel with them in that regard, so we can

12   avoid any delay.

13           I don't -- Is it my turn to respond

14   to what counsel said?

15               THE COURT:  Well, no.  I really

16   haven't finished.

17               MR. VALDEZ:  Did you have more

18   questions, Judge?  Our position is that the

19   motion should be denied.  And that's what we're

20   asking, is that the motion for continuance be

21   denied and that we go ahead with the trial on

22   October 9th.  We're ready to go.

23               THE COURT:  Okay.  You can

24   close.

25               MR. TINKER:  Well, Your Honor,

1    first, it's -- it's interesting.  Counsel has

2    said that I have tried to get embezzlement in

3    the trial.  Counsel -- the Court knows, counsel

4    has always said that they intend, through

5    Mr. Quintanilla, to say, in the trial -- trial

6    on the merits, their case, that my client had

7    been stealing from some entity of Selena's or

8    Mr. Quintanilla.  They've all long said that.

9    And every time they say that, I say, "Well, I

10   would want the records, so that I can defend

11   from that accusation."  That's been my position

12   all along.  I don't think that's part of the

13   case.  I don't believe it to be true.  But if

14   they're gonna -- if they're gonna just permit a

15   witness to make a bald statement -- bald-faced

16   statement like that, I've long said that I want

17   those records.

18            They now -- and the Court will recall

19   that, at the first hearing we ever had, they

20   said they'd have those records by July the 1st,

21   or early in July.  I can't remember if it was

22   July the 1st, or not.  They didn't have those

23   records.  They said, "Well, there's a lot of

24   records and it's taking a long time."  I have

25   always said, in each of these hearings, I need

FORM CSR - LASER  REPORTERS PAPER & MFG CO  800-626-6313

1    to get those things, so that I can prepare a

2    defense, in this case.  I've been saying that

3    since the first pretrial hearing.

4              Counsel, interesting to me, knows

5    that my motion says that I don't want the case

6    presented to the grand jury, because of the

7    effect it might have on this trial, and he

8    seems to think that I'm asking that Your Honor

9    speed it up.  He's saying, well, Your Honor

10   wants us to speed it up.

11             I -- I -- The paper quotes counsel as

12   saying that this case will be -- this morning's

13   paper -- that this case is probably gonna be

14   presented for indictment, this em-- this

15   embezzlement case, this Thursday.  Now, once

16   that occurs, it's claimed by these lawyers for

17   the prosecution that they have an open file

18   policy in their office.  And I assume that once

19   that happens, they will not change that policy,

20   as far as this defendant is concerned, but I

21   need those records.

22             If they're gonna present it to the

23   grand jury, it's my opinion that doing that --

24   and I'm gonna ask for ask for -- if she gets

25   indicted, I'm gonna ask for a continuance, and

1   I'm gonna Your Honor to rule on that issue, of

2   course, because I'm not ready.  They've already

3   said, again, that they intend to -- and I'll

4   ask counsel to respond.  Has he said and does

5   he intend to introduce this during any part of

6   the trial the evidence concerning this

7   embezzlement?  Counsel is quoted in the paper

8   as saying they're gonna do it in the punishment

9   phase, if there is a punishment phase in the

10  case.  I'm entitled to prepare a defense from

11  those kind of accusations and that's the

12  position I take.

13              THE COURT:  All right.  I'm

14  gonna deny the motion.  Incidentally -- and I'm

15  not -- I'm not saying anyone's violated it, but

16  I'm gonna give y'all a little assignment.

17  Y'all remember my letter several months back?

18  I would like for y'all to review that letter,

19  from time to time.  Maybe once a week between

20  now and trial.

21              That is all.

22              MR. VALDEZ:  Judge, there's a

23  couple of other matters.

24              THE COURT:  I didn't realize

25  that.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

```
 1    Book," that's kept by the people at the fan
 2    club?
 3    A.    It was a lot of colored notebooks.    I
 4    don't know.    They were all kinds of colors.
 5    But there was a blue book.
 6    Q.    And how large of a -- and how many
 7    documents or how many of these books were kept?
 8    A.    There's about five books.
 9                    MR. VALDEZ:  Excuse me,
10    Your Honor, at this time, I'm going to object
11    to -- to the relevancy of this line of
12    questioning.  It's all very interesting, but --
13    but we're here to determine whether or not the
14    subpoenas issued to Mr. Quintanilla should be
15    quashed, and this is turning into another
16    fishing expedition to try to find out some --
17    he's turned this into an evidentiary hearing,
18    Judge, and -- and we object to any other
19    questions on this issue.
20                    THE COURT:  Where are we
21    heading, sir?
22                    MR. TINKER:  If you'll let me
23    ask the questions, I'll show you, Your Honor.
24    What I'm gonna prove through this witness is
25    that Mr. Quintanilla, because of a conflict
```

I. HERRERA DIRECT BY MR. TINKER          344

1   with Yolanda, came and got all of the fan club

2   records, and I think that's relevant to them

3   saying that they don't have certain records.

4   And I think that Your Honor should want to hear

5   about that.

6                    MR. VALDEZ:  If he asked her

7   that, that's fine, Judge.

8                    MR. TINKER:  Well, could I --

9   could I do that?

10                   THE COURT:  Yeah.

11  Q.   (By Mr. Tinker) I was asking you how

12  large -- or how many notebooks did you have?

13  A.   There was about five -- about five

14  notebooks and most of them were empty.

15  Q.   Okay.  But they were -- and those that had

16  writing in them, was that writing done by you

17  and, also, Yolanda?

18  A.   No.  We had a red book where we had rules

19  that each officer had to sign, but that was the

20  only thing that I ever got to sign.

21  Q.   What did these notebooks -- what did these

22  books contain?  What did --

23                   MR. VALDEZ:  Excuse me,

24  Your Honor.  Same objection.  He still hasn't

25  asked a question.  And he wants to get as much

I. HERRERA DIRECT BY MR. TINKER          345

1    information as possible, using this hearing,

2    which really has nothing to do with the matter

3    at hand, here, so we object, again.

4                    THE COURT:  Overruled.  Go

5    ahead.

6    Q.   (By Mr. Tinker) What was contained in the

7    books?

8    A.   I didn't see them, till -- there was some

9    for a special event; there was contributions,

10   which was empty; the rules and regulations of

11   each officer, that we signed, that we would not

12   use Selena's name to get items from, like,

13   Coca-Cola or things like that.

14   Q.   But did -- were there other records, other

15   than those books, that Mr. Quintanilla picked

16   up?

17   A.   No, that was it.

18   Q.   Were there other records kept there that

19   -- in your home, other than those that

20   Mr. Quintanilla picked up, concerning the fan

21   club?

22   A.   No.  I just gave him fan club stuff.  I

23   don't have anything else.

24   Q.   You just gave him what?

25   A.   The fan club notebooks.  I don't have

1   that of Mr. Quintanilla.  These are records

2   that he, certainly, doesn't have any standing

3   for any possessory interest.  Now, if he wants

4   to have Articles of Incorporation -- he asked

5   for Articles of Incorporation -- those are

6   public records.  Those can very well be

7   obtained by contacting the Secretary of State,

8   which, for a small fee, they'll be more than

9   glad to provided them for him.

10          So I submit to the Court, they're so

11  broad, so encompassing, so devastating,

12  Your Honor, for a family to be going out there

13  and say, "All right, let's go out there and

14  dream up why we're saying these things and give

15  it to the defense."

16          We have turned over, Judge -- before

17  I came into this case -- we have turned over

18  some documents to the state.  I don't know what

19  they were.  I don't know if they were Bate

20  stamped for any control, but I'm more than sure

21  that whatever we gave to the state Mr. Tinker

22  can obtain from the state.  If I give anything

23  to Mr. -- to -- to the state, I'm more than

24  sure that they are duty-bound, pursuant to the

25  Rules of Discovery, to turn them over to -- to

```
1    opportunity to provide similar legal

2    authority -- I think, I can deal with this

3    matter much more efficiently when I have

4    well-grounded myself in the relevant legal

5    principles.

6                    MR. TINKER:  Again, Your Honor,

7    I do request that whatever records that this

8    lady gave -- whatever they were, they gave to

9    Mr. Canales' client, Mr. Quintanilla, I want

10   those made available to the Court for in camera

11   inspection and I want --

12                   THE COURT:  Well, I think you're

13   entitled to that.

14                   MR. CANALES:  Sure.  Sure.

15                   MR. TINKER:  I'm sorry?

16                   THE COURT:  I think you're

17   entitled to that.

18                   MR. CANALES:  Sure.  I'll keep

19   them in my office, Judge.

20                   MR. TINKER:  Your Honor, I don't

21   want them kept in his office.  I'd like them

22   kept in your office.

23                   THE COURT:  Well, he knows what

24   "in camera" means.

25                   MR. TINKER:  You --
```

CYNTHIA MOTAL, CSR, RPR                355

1          THE COURT:  You will provide

2    them to the Court for my inspection.

3          MR. CANALES:  Sure.

4          MR. TINKER:  All the records

5    we've requested that they have.  And I'd like a

6    notation --

7          THE COURT:  Well, let's just

8    start with that, Mr. Tinker, if you don't mind.

9    I'm not -- I'm not cutting you off, at this

10   point, but I'm gonna start off with that and

11   see where this is going.

12          Anything else?

13          MR. TINKER:  Well, I have a

14   number of questions, Your Honor, but --

15          THE COURT:  Well, --

16          MR. TINKER:  -- Your Honor

17   ruled --

18          THE COURT:  I'm ruling that you

19   cain't do it right now.  I'll provide that

20   opportunity.

21          MR. TINKER:  That's all the

22   questions I have of this witness.

23          THE COURT:  All right.  Anyone

24   else have any questions?

25          MR. CANALES:  None, sir.

1    the police are constructively in your file.

2                    Do you know if they exist?

3                            MR. VALDEZ:  I don't know if they do.

4                            THE COURT:  Well, at least inquire.

5                            MR. VALDEZ:  Anybody?  That is not

6    relevant to anything at all?  Anything that the police

7    have turned over?  Is that what the rule is?  Because the

8    other objections about relevancy, the defense is looking

9    for an opportunity to create something out of nothing.

10                           THE COURT:  Find out if they exist.

11                           MR. TINKER:  If the prosecution and law

12   enforcement people think it is important enough for them

13   to look at in their information, preparation of this case

14   and trial, I'm entitled to look at them, too.  And counsel

15   has no control over those.

16                           MR. VALDEZ:  If we have not looked at

17   them in preparation of this trial -- because we have not

18   looked at them.

19                           MR. TINKER:  What's the Court's ruling?

20                           THE COURT:  My ruling is, you're to

21   inquire if they have them.

22                    And then you have turn them over to me _en_

23   _camera_, or turn them over to Mr. Tinker.

24                           MR. VALDEZ:  I'll do that, Judge.  I'll

25   turn them over to the Court for inspection.

1  Copies of any and all audio and/or video tape recordings

2  regarding the stand-off and any --

3              THE COURT:  Yes, that's correct.

4              MR. TINKER:  Number 24, Your Honor, is

5  any and all records, documents or summaries -- this is to

6  the claim of embezzlement.  And we have already spoken to

7  that, and it's my understanding that you're going to look

8  at those documents.

9              THE COURT:  I have told them to find

10 out if they have any and to turn them over to me en

11  camera.

12             MR. TINKER:  And you still have under

13 advisement the subpoenas that I have requested for the

14 same records?

15             THE COURT:  Well, one of them is not

16 under advisement.  I told Mr. Canales to give me the fan

17 club records.  And I expect those -- I still have not

18 gotten them, but I expect them.  I either expect those, or

19 Mr. Canales knows what to do if he doesn't want to do it.

20             MR. TINKER:  Well, in any event, are

21 the other subpoenas of records, requests, are they still

22 under advisement?

23             THE COURT:  Absolutely.

24             MR. TINKER:  Okay.

25             MR. VALDEZ:  Judge, on Number 24, it's

                                    0000 0000 3813 2550

```
 1  policy consideration.  I don't have any business going

 2  through, being in the --

 3                  MR. TINKER:  May I respond?  All I want

 4  is a ruling from the Court.

 5                  THE COURT:  Yes.

 6                  MR. TINKER:  The Court knows already

 7  that they are going to let Mr. Quintanilla, and perhaps

 8  others, -- and Paul Rivera has already said it -- say that

 9  they believe my client is embezzling.  And, Your Honor,

10  then is ruling that during the trial of this murder

11  case, -- and Your Honor is ruling that I don't get to see

12  the files that would reflect one way or the other whether

13  or not that is the truth.

14                  THE COURT:  Well, that's not entirely

15  correct.

16                  MR. VALDEZ:  I may be able to help the

17  Court --

18                  MR. TINKER:  No, let me finish.

19            Is that --

20                  THE COURT:  It's not entirely correct,

21  Counsel, because I have said I want any records that have

22  been turned over by the Quintanillas or any entities

23  connected with the Quintanilla family.

24                  MR. TINKER:  Well, my only request is

25  that you're going to look at those en camera and make a
```

1    decision what I'm entitled to.  I'm requesting that all

2    the records -- whether they're reports, whether they're

3    summaries by investigating officers -- if Your Honor is

4    not going to look at them, I am requesting that they be

5    sealed, and write on there:  "Tinker didn't get to see

6    this in preparing his defense," and be made part of the

7    record so that if Your Honor won't look at them, maybe

8    some appellate court will, if that's necessary in the

9    future.

10                   THE COURT:  I'll consider that, but I'm

11   not going to require it right now.  You will have an

12   opportunity to do that.  Right now, I want to see records

13   from the Quintanillas en camera if they have been turned

14   over.

15                   MR. TINKER:  Well, --

16                   THE COURT:  We do have some evidence

17   that they have been turned over.

18                   MR. VALDEZ:  They are in police

19   custody, some records, Judge.

20                   THE COURT:  All right.

21                   MR. VALDEZ:  And whatever they have,

22   we'll bring to the Court.

23                   THE COURT:  All right.

24                   MR. TINKER:  Your Honor, Number 25 is

25   any records reflecting that the deceased had had

```
 1                    MR. VALDEZ:  Yes, I figured that

 2    that's what the Court had done.

 3                    THE COURT:  All right.  So I

 4    need an order on that.  So, I guess, there's

 5    three orders, depending on how you count them.

 6            And as I've already indicated, last

 7    time we had something come up about a

 8    document, and I forget the context, but it came

 9    up that there was some question about it, so --

10    that is, in all this -- these two boxes that I

11    have from the Quintanilla interests, and

12    somehow or another some interchange came up

13    about a document.  And I intend to turn that

14    dock-- it's actually a document -- over to Mr.

15    Tinker.  But it was after review of the entire

16    two boxes that I saw it and I might not find it

17    that easily.

18                    MR. TINKER:  For the record, I'd

19    just suggest that I could assist the Court in

20    that regard.

21                    THE COURT:  Yeah, I'm sure you

22    would, but, no thank you.  I'll have to decline

23    your kind offer.

24            But it will take -- I guess, it will

25    take me almost as long -- well, no, it wouldn't
```

1  do anything?

2  A.  Yes, I did.

3  Q.  What did you do?

4  A.  I went to San Antonio and I recovered all

5  the --

6          MR. TINKER:  Your Honor, may we

7  approach the bench?

8          (Discussion at the bench.)

9          MR. TINKER:  Your Honor, we attempted

10  to discover these records, we were prohibited from

11  doing so.

12          Well, you gave us records; but

13  they're not these fan club records that he

14  obtained.

15          They filed a motion to suppress.  All

16  we got was what the District Attorney's Office had,

17  not what this witness had.  At the time, counsel

18  said we're just going to ask him if he suspected

19  embezzlement, he said.  They're going into details

20  of this and we don't have any records to look at.

21  We tried to find them ahead of time.

22          MR. VALDEZ:  I haven't asked him

23  anything about records.

24          MR. TINKER:  Well, he just asked

25  him:  Did you go?  And he said he went and got

(C) S.Oballe 1995 -- All Rights Reserved

1    records.  And I'm saying that we tried to discover

2    these and have not been able to do so.

3              THE COURT:  At this time, I don't

4    sustain the objection to this line of questioning,

5    but any details about it I would.

6    Q.  (By Mr. Valdez)  Mr. Quintanilla, as a result

7    of your further investigation in this matter, did

8    you form an opinion or form any suspicions about

9    the activities of Yolanda Saldivar?

10   A.  I did.

11   Q.  What were -- what was that opinion or

12   suspicion?

13   A.  That she was taking money from the fan club.

14   Q.  And did you take any action after that, after

15   you formed this suspicion?

16   A.  I talked to her and told her that I wanted to

17   bring all the records to our office.  And that from

18   this point on that we were going to run the fan

19   club through our office, because Selena's image was

20   being tarnished because people were blaming her.

21   Q.  Did you talk to her in person or on the phone?

22   A.  In person, there in our office.

23   Q.  Do you remember when that meeting occurred?

24   A.  You're talking about the first -- the very --

25   Q.  The meeting that you're talking about, when you

(C) S.Oballe 1995 -- All Rights Reserved