1   A.   Well, I had recovered the records for the fan

2   club, and we found proof that she was stealing.

3                    MR. TINKER:   Your Honor --

4                    Excuse me.

5                    I object to this.   He's now

6   testifying about the records that we've been trying

7   to get him to show us at this time.

8                    THE COURT:   I'm going to sustain the

9   objection, for now.

10                   MR. TINKER:   I request that the jury

11  be instructed to disregard.   If we can't see those

12  records, he shouldn't be testifying about them.

13                   THE COURT:   That is my instruction,

14  for now.   We'll have a hearing on this matter.

15                   As a matter of fact, members of the

16  jury, I think we'll dismiss you at this time.   And

17  have a nice lunch, and we'll see you back here at

18  1:00 o'clock.

19                   (Jury released to jury room -

20  11:30 a.m.)

21                   MR. TINKER:   Are we still in session,

22  Your Honor?

23                   THE COURT:   Yes, we are.   You may

24  proceed.

25                   MR. TINKER:   Well, when you're

(C) S.Oballe 1995 -- All Rights Reserved

1   referring to the records, what records are you

2   referring to, Mr. Quintanilla?

3                   THE WITNESS:  The fan club records.

4                   MR. TINKER:  Where would those

5   records be?

6                   MR. VALDEZ:  Excuse me.

7                   Your Honor, is this voir dire?  Is he

8   taking him on voir dire or what?

9                   THE COURT:  I don't know.

10                  MR. TINKER:  Well, you told me to

11  proceed; and it's not my turn.

12                  THE COURT:  I think it's a legal

13  matter first that we need to resolve.

14                  MR. TINKER:  Well, the issue, Your

15  Honor, is that we have tried to subpoena these

16  records.  We tried to discover them in the

17  discovery motion.  He is now testifying or

18  attempting to testify that he looked at these

19  records that he got from the fan club and concluded

20  that she was stealing.  Now, if he gets to look at

21  them and make those conclusions, we get to see what

22  it is that he saw.  And we should have been able to

23  see those prior to trial.

24                  THE COURT:  Mr. Tinker, the Court has

25  granted all records that relate to the testimony in

                                                      917

(C) S.Oballe 1995 -- All Rights Reserved

 1  this case.

 2              MR. TINKER:  Well, Your Honor, but

 3  that's not what he's talking about.  What you've

 4  given to us is what they have.  I want to ascertain

 5  what records he's referring to.  It's not going to

 6  be what you're talking about.

 7              MR. VALDEZ:  Your Honor, it is the

 8  State's contention that what Mr. Quintanilla is

 9  talking about are the records that he turned over

10  to the Court.  Those are the records that he based

11  his suspicions on, those are the records he's

12  talking about.  Everything has been turned over to

13  the Court.  Whatever the Court turned over to the

14  defense, we don't know; but those are the records

15  he's talking about.  That's our contention and we

16  can --

17              THE COURT:  You don't know what the

18  Court turned over, do you?

19              MR. VALDEZ:  No, sir.

20              THE COURT:  You've been given a

21  letter to that effect, sir.

22              MR. VALDEZ:  But nothing was attached

23  to the letter.  It was just a letter saying that

24  certain records had been turned over to the

25  defense.  It doesn't say what records, it didn't

(C) S.Oballe 1995 -- All Rights Reserved

```
 1   have anything attached.
 2               MS. STERLING:  I believe --
 3               MR. TINKER:  But, Your Honor, the
 4   main problem is the records, we have them here,
 5   that you turned over to us are not fan club
 6   records, they are Selena Etc. records.  We have
 7   received no fan club records.  That's why in
 8   pretrial we were saying we need these, because this
 9   is what we knew was coming.  They said they weren't
10   going to do this.
11               THE COURT:  All right.
12               MR. TINKER:  I would like to show you
13   what they gave us.
14               THE COURT:  Let's stand by for a
15   minute.
16               When do they need to take the jury
17   out?
18               THE BAILIFF:  Well, I'm waiting on
19   you.
20               THE COURT:  So go ahead, and we'll
21   just stop whenever you're ready to take them out.
22               Make your offer.
23               MR. TINKER:  I know we're kind of in
24   a break, Your Honor, but I -- well, anyway, let me
25   address the Court with regards to the records.  I
```

919

(C) S.Oballe 1995 -- All Rights Reserved

1  would like to make a record of exactly what it is

2  Your Honor gave us, and they're not fan club

3  records, they are Selena Etc. records.

4          THE COURT:  Well, I'm not sure that

5  they're that indivisible, perhaps you could develop

6  that from the witness.

7          MR. TINKER:  They're two separate

8  incidents.  He's already said that he didn't have

9  anything to do with it.  He said he looked at the

10  fan club records and decided she was stealing.

11          THE COURT:  I'm suggesting it's not

12  developed to the witness.  If either one of you

13  wish --

14          MR. TINKER:  I was starting to ask

15  him questions.  If you want them to do it, I'll let

16  them do it.

17          THE COURT:  They have the first

18  option.  It's their witness

19

20

21

22

23

24

25

920

(C) S.Oballe 1995 -- All Rights Reserved

```
1              CONTINUATION OF DIRECT EXAMINATION

2                OUTSIDE THE PRESENCE OF THE JURY

3    BY MR. VALDEZ:

4    Q.  Mr. Quintanilla, did you obtain certain records

5    from the fan club?

6    A.  I did.

7    Q.  And what did you do with those records?

8    A.  I gave them to Tony Canalis; and, I think, they

9    were turned over to -- if I understood, to the

10   Court.

11   Q.  Did you give them to your lawyer, who's

12   representing you, Mr. Canalis?

13   A.  Yes, sir.

14   Q.  And that was supposed to be turned over to the

15   Court?

16   A.  Yes, sir.

17   Q.  Those were the records upon which you based

18   your suspicions and based your opinion?

19   A.  Yes, sir.

20   Q.  You turned everything over to the Court?

21   A.  Yes, sir.

22   Q.  Now, as far as the records for Selena Etc., did

23   you have some of those records also?

24   A.  No, sir.

25   Q.  You don't have any of those records?
```

921

(C) S.Oballe 1995 -- All Rights Reserved

```
 1   A.   I don't have any of those.   I had nothing to do
 2   with her business.
 3   Q.   Pardon me?
 4   A.   I was not involved with her business of
 5   Selena Etc.
 6   Q.   Do you know if anybody else has those records?
 7   A.   Well, I know that -- that there was several
 8   attempts to bring them back from Yolanda.   She had
 9   taken them with her.
10   Q.   Do you know if anybody else that's employed by
11   you has those records?
12   A.   No, sir.
13              MR. VALDEZ:   That's all the questions
14   I have, Your Honor.
15
16
17
18
19
20
21
22
23
24
25
```

922

(C) S.Oballe 1995 -- All Rights Reserved

```
 1                    CROSS-EXAMINATION

 2           OUTSIDE THE PRESENCE OF THE JURY

 3

 4    BY MR. TINKER:

 5    Q.  Didn't -- Mr. Quintanilla, didn't -- weren't

 6    those fan club records turned over to your

 7    accountant?

 8    A.  To my who?

 9    Q.  Your accountant?

10    A.  No, sir.

11    Q.  What did you do with the fan club records that

12    you claim you looked at?

13    A.  I gave them to Mr. Tony Canalis.

14                    MR. TINKER:  Your Honor --

15    Q.  (By Mr. Tinker)  And those are the records that

16    you were referring to when you were trying to

17    answer the question about whether or not you had

18    decided --

19    A.  Those are the ones --

20    Q.  May I finish the question?

21    A.  I'm sorry.

22                    THE COURT:  Excuse me, counsel.  The

23    Court is the only one here that instructs

24    witnesses.  Now, counsel, I want to say to you

25    right now the witness has apologized.  No apology
```

923

(C) S.Oballe 1995 -- All Rights Reserved

1  is required, but he does need to be given some

2  instructions about courtroom procedure, in the

3  interim.

4              You do need -- he is correct.  You do

5  need to let him finish the question.

6              Continue.

7  Q.  (By Mr. Tinker)  Mr. Quintanilla --

8              THE COURT:  Just one moment.  We'll

9  allow the jurors to leave.

10             (Jurors are taken through the

11 courtroom.)

12             THE COURT:  You may continue.

13 Q.  (By Mr. Tinker)  When you were about to answer

14 the question about you looked at records and

15 concluded that there was a theft or whatever your

16 answer was going to be, were you talking about fan

17 club records?

18 A.  Fan club records.

19             MR. TINKER:  May I approach the

20 bench, Your Honor?

21             THE COURT:  Uh-huh.

22             MR. TINKER:  What I would like to

23 tender to the Court, Your Honor, and I apologize to

24 the Court.  These are records that we made a copy

25 of that you gave us for our client to look at.  So

924

(C) S.Oballe 1995 -- All Rights Reserved

1  there's some notes of her's on here, and we'll get

2  copies of them.  But the records that you gave us,

3  Your Honor, which is a set right here --

4             THE WITNESS:  I would like to clarify

5  that a little bit more.

6             THE COURT:  You may.

7             THE WITNESS:  What I found was a

8  check that she had made out to herself where we

9  checked the signatures, there were forged

10  signatures.  We also found a letter where she wrote

11  to Bank One of San Antonio pretending that she's

12  her sister, Lang; and she sends this girl, Yvonne

13  Peralez, to deposit $3,000 cash to the bank, and

14  then supposedly this girl ran off with the money.

15  And I asked her who Yvonne Peralez was and her

16  answer in front of Selena and Suzette was that she

17  didn't know who this Yvonne Peralez was.

18             And I said, "You didn't trust the

19  officers of the fan club, the treasurer, with the

20  money; but you trust a stranger to go deposit

21  $3,000, and that stranger disappears?"

22             THE COURT:  All right.

23             THE WITNESS:  That's what the records

24  that I found.

25             THE COURT:  All right.  Go ahead.

(C) S.Oballe 1995 -- All Rights Reserved

1  Q.  (By Mr. Tinker)  And those were fan club

2  records, were they not, Mr. Quintanilla?

3  A.  They were checks and letters that she wrote.

4  Q.  And you gave those to your lawyer, Mr. Canalis,

5  for him to file a motion to prevent us from seeing

6  those, didn't you?

7  A.  No.  Q Productions' are the ones we filed to

8  quash.

9  Q.  But you gave them to the same lawyer?  The same

10  lawyer has those records that filed the motion to

11  quash?

12  A.  I gave everything -- I mean, the records are

13  those papers that we found.

14  Q.  To Tony Canalis?

15  A.  To Tony Canalis.

16  Q.  And he's the same lawyer that filed the motion

17  to prevent us from discovering your records, isn't

18  that true?

19  A.  For Q Productions, yes.

20  Q.  And that's where those records are today, to

21  your knowledge?

22  A.  I don't know about that.

23  Q.  The records that you're relying on to testify

24  today are in the hands of your lawyer, Tony

25  Canalis?

(C) S.Oballe 1995 -- All Rights Reserved

1  A.  I don't know.

2  Q.  That's the last time you saw them, that's where

3  they were?

4              THE COURT:  Well, for the record,

5  they're in the court.

6              MR. TINKER:  Well, at least copies

7  are in the court.

8  Q.  (By Mr. Tinker)  In any event, that's the last

9  time you saw them?

10  A.  Yes, sir.

11              MR. TINKER:  Your Honor, I just

12  wanted to tender to the Court.  These are the

13  documents that you turned over to us, and you'll

14  see that none of them are fan club, they're all

15  Selena Etc., and those are -- and again, I don't

16  want to make it part of the record because they

17  have my client's notes.

18              THE COURT:  All right.  Anything

19  further?

20              MR. TINKER:  Now, with regard to this

21  issue, Your Honor, I would request, again, that the

22  jury be instructed to disregard these comments

23  about what he discovered from looking at those

24  records.  We haven't seen them, we tried to see

25  them.  I request that his testimony concerning his

927

(C) S.Oballe 1995 -- All Rights Reserved

1  conclusion of theft be stricken, not just his

2  conclusions about the records, but his

3  conclusions, because we have no way of

4  cross-examining him without the records.  And I

5  request that they be required to go into other

6  matters when the jury comes back.

7              THE COURT:  Anything further?

8              MR. VALDEZ:  Your Honor --

9              THE COURT:  Of the witness?

10             MR. VALDEZ:  Your Honor, nothing's

11 been offered as far as records are concerned.  If

12 there were records, they wouldn't be offered for

13 the truth of the matter of certain in those records

14 other than -- the only offer would be to show that

15 Mr. Quintanilla had formed an opinion and formed a

16 suspicion based on that record, and he can testify

17 to that.  There's nothing wrong with that.

18             MR. TINKER:  Your Honor, any time

19 that he's basing his opinion on records, we're

20 entitled to see those records.  We're entitled to

21 see them prior to trial.  If the Court is going to

22 permit this and -- as a matter of fact, at this

23 time, because of what he's already testified to, I

24 ask for a continuance for at least one week.  We're

25 going to have to deal with this issue so we can

928

(C) S.Oballe 1995 -- All Rights Reserved

1  have those records.

2            I'll request, if they're in your

3  possession, that you turn those over to me.  It is

4  our belief that there are other records which we

5  have also subpoenaed, which Tony Canalis, his

6  lawyer, prohibited us from seeing by filing a

7  motion to quash.  And I request a continuance of a

8  week so we can look at those records and prepare

9  for cross-examination of this witness.

10            THE COURT:  Okay.  Motion for

11 continuance is denied.

12            I want to clarify a few things with

13 the witness, outside the presence of the jury.

14            Mr. Quintanilla, your attorney,

15 Mr. Canalis, delivered to the Court two legal boxes

16 of material.  Were you familiar with the contents

17 of those boxes?

18            THE WITNESS:  Well, I thought one was

19 the one that I gave him, those checks and the

20 letter that she wrote to Bank One, and I assumed

21 that the other ones were of Selena, Etc.

22            THE COURT:  Okay.  And so they were

23 both those records?

24            THE WITNESS:  Yes, sir.

25            THE COURT:  Okay.

929

(C) S.Oballe 1995 -- All Rights Reserved

```
 1                    Anything further of the witness?
 2                    MR. TINKER:  I have nothing further
 3   from the witness, Your Honor.
 4                    THE COURT:  Then the witness may
 5   stand down.  Thank you, sir.
 6                    We'll resume at 1:00 o'clock.
 7                    Anything further at this time?
 8                    MR. TINKER:  I don't know that you
 9   ruled on that.
10                    THE COURT:  Not as to motion for
11   continuance.
12                    MR. TINKER:  I understand that.
13                    THE COURT:  To the extent that you
14   have raised an issue at this time, the Court
15   believes that it has provided you with the records
16   that are pertinent to this aspect of the case.
17                    MR. TINKER:  You're going to permit
18   him to testify that he looked at fan club records
19   and concluded there was theft from fan club records
20   and you have not given us any fan club records?  I
21   just want the record to reflect that.
22                    MR. VALDEZ:  No.  That's just not in
23   the record, Your Honor.  He's just making that up.
24   That's not in the record.
25                    MR. TINKER:  Your Honor, I would like
```

930

(C) S.Oballe 1995 -- All Rights Reserved

1  to be sworn to testify under oath that I have not

2  received any of those fan club records, and I've

3  attempted to discover those.

4             THE COURT:  Before we hear your

5  offer, what is your response to the fan club

6  records?

7             MR. VALDEZ:  Your Honor, we're just

8  rehashing matters that were already taken care of

9  at pretrial.

10            THE COURT:  Okay.  Counsel, I want a

11  factual response.

12            MR. VALDEZ:  The factual response is

13  this, Your Honor:  The records that Mr. Quintanilla

14  is testifying about were made available to the

15  Court for inspection to turn over to the defense.

16  And that's everything that he's talking about so

17  far, that he's talked about so far has been made

18  available.  We're not going into any other matters

19  that have not been made available.  Everything that

20  Mr. Quintanilla had was turned over to the Court.

21            THE COURT:  All right.  That is my

22  belief at this time.

23            MR. TINKER:  Your Honor, turning them

24  over to the Court doesn't assist the defense in

25  cross-examining a witness who's testifying from the

931

(C) S.Oballe 1995 -- All Rights Reserved

1  records that you have.

2            THE COURT:  Yes, sir.  And they will

3  remain with the Court in the file.  And they will

4  be available.

5            MR. TINKER:  I want the record to

6  clearly reflect that the fan club records have not

7  been turned over to us.

8            THE COURT:  I'm not going to state

9  that.

10           MR. TINKER:  Well, I would like to

11  have him testify that that's true.

12           MR. VALDEZ:  Your Honor --

13           THE COURT:  Let's see.

14           Mr. Quintanilla, I believe you have

15  to leave at this time.  Sorry.

16           MR. SKURKA:  Your Honor, will he be

17  required to testify again this morning?

18           THE COURT:  No.  Not this morning.

19  1:00 o'clock will be fine.

20           Do you want to be examined or --

21           MR. TINKER:  Well, I think I'll wait

22  until he leaves, Judge.  I can do it or he can do

23  it.

24           THE COURT:  Well --

25           MR. HAGANS:  I'll try.

932

(C) S.Oballe 1995 -- All Rights Reserved

1                    DOUG TINKER,

2    having been first duly sworn, testified as follows:

3

4                 DIRECT EXAMINATION

5

6    BY MR. HAGANS:

7    Q.  Mr. Tinker, before this trial began, were you

8    aware of allegations or suspicions that

9    Mr. Quintanilla would testify or attempt to testify

10   that he had examined fan club records?

11   A.  I don't know that I knew he was going to say he

12   examined fan club records.  I knew that he was

13   going to say that he had obtained fan club records

14   from San Antonio.

15   Q.  And based on that, did you attempt to obtain

16   fan club records?

17   A.  I did.

18   Q.  On more than one occasion?

19   A.  I filed a motion to discover, which is on

20   record here.  I got subpoenas out, attempting to

21   subpoena those records.  And when you say, "on more

22   than one occasion," I'm sure in pretrial -- we had

23   more than one pretrial -- on each of those

24   occasions we raised those issues.

25   Q.  As of this time, have you been provided by the

933

(C) S.Oballe 1995 -- All Rights Reserved
0000 0000 3332 2488

1    Court any fan club records?

2    A.   No.

3    Q.   Were you provided records regarding Selena

4    Etc.?

5    A.   We were provided some records, not all that we

6    requested.   Those -- and, again, I realize the

7    copies the Judge provided us are in your office.

8    I'd like to have those made a part of the record

9    here so it will show what we did receive.   We

10   didn't receive all the records from Selena Etc.

11   What we did receive, as I understand, is those

12   Selena Etc. records that had been turned over to

13   the District Attorney because of an investigation

14   of embezzlement.   That's my understanding of what

15   those records reflect.

16   Q.   But with respect to any fan club records, as of

17   this time, have you been provided those or had an

18   opportunity to review them?

19   A.   No.

20   Q.   Do you feel that in order to properly protect

21   your client's Constitutional rights you need to be

22   able to see those in order to confront the

23   witnesses that have been brought forward to testify

24   against her?

25   A.   If Mr. Quintanilla's going to be permitted to

(C) S.Oballe 1995 -- All Rights Reserved

1  testify that he looked at records and concluded

2  that there was theft or embezzlement, it's my

3  position that my client, Yolanda Saldivar, will be

4  denied effective assistance of counsel and the

5  right to confront and cross-examine, as that right

6  is guaranteed by the Constitution of the United

7  States and the State of Texas, because I cannot use

8  the records he relied upon in drawing his

9  conclusions.

10            MR. HAGANS:  I think that's all the

11  questions I have.

12            THE COURT:  All right.

13            Anything to say?

14

15

16

17

18

19

20

21

22

23

24

25

935

(C) S.Oballe 1995 -- All Rights Reserved

1                    CROSS-EXAMINATION

2

3    BY MR. VALDEZ:

4    Q.   Mr. Tinker, what records have you received?

5    A.   I received the records that, again, are a

6    package of records that I understand, and I'll make

7    -- I've got them here, but my client has written

8    on the copies, we will file those soon after lunch,

9    but they are Selena Etc. records and no fan club

10   records.

11   Q.   Did you hear Mr. Quintanilla say that he turned

12   over all the records that he's testifying about to

13   the Court?

14   A.   No.  Mr. Quintanilla did not say that.  He said

15   he turned them over to his lawyer.

16   Q.   Did you hear him say that his lawyer turned

17   them over the Court?

18   A.   What I heard him say was the last time he saw

19   those records was when he gave them to his lawyer.

20   Q.   Do you remember at pretrial the Court asking

21   the lawyer to turn over the records for inspection

22   in camera?

23   A.   I do remember that.

24   Q.   Do you remember the lawyer agreeing to comply

25   with that request?

936

(C) S.Oballe 1995 -- All Rights Reserved

1  A.  I remember the lawyer agreeing to do so.

2  Q.  Now, do you know whether or not that was done?

3  A.  I assume he turned over records to the Court;

4  but, since I didn't see those records, I can't

5  testify to what it was.

6  Q.  So you don't know exactly what records we're

7  talking about?

8  A.  No.  And that's the point, I don't know what

9  he's talking about, I don't get to see them.  If I

10  don't get to see them, how can I cross-examine this

11  man?

12  Q.  Mr. Tinker, if you don't know what he's talking

13  about, how do you know you haven't seen them?

14  A.  I haven't seen any fan club records.

15          THE COURT:  All right.

16          MR. HAGANS:  Judge, I do have one

17  other question after he's finished.

18  Q.  (By Mr. Valdez)  What records have been turned

19  over to the District Attorney's office?

20  A.  Have been turned over to you?

21  Q.  Yes.

22  A.  I have no clue.

23  Q.  You testified a little while ago that the

24  records that were turned over to the District

25  Attorney's office, the Selena Etc. records, you

(C) S.Oballe 1995 -- All Rights Reserved

1  have no idea what's been turned over to our office,

2  you have no idea what we have.  You're just saying

3  that because you don't know.

4  A.  Ask those questions one at a time.

5  Q.  That's all.

6  A.  In answer to your question.  What I said was:

7  That it's my understanding the records that I

8  received from the Court were records that were

9  turned over to the Court by the District Attorney's

10  Office.  But that doesn't tell me all the other

11  stuff you may have that you haven't shown me.

12              THE COURT:  All right.

13

14

15

16

17

18

19

20

21

22

23

24

25

938

(C) S.Oballe 1995 -- All Rights Reserved

```
1                    REDIRECT EXAMINATION

2

3   BY MR. HAGANS:

4   Q.  With respect to the records that you actually,

5   received, was it a group of records approximately

6   three-quarters of an inch to an inch thick?

7   A.  Yes.  It's the records that are reflected that

8   I showed the Court.

9   Q.  It certainly wouldn't comprise one or two boxes

10  of records that Mr. Quintanilla testified about?

11  A.  No.  Certainly not.

12                  THE COURT:  For the record, the Court

13  has inspected the entire two boxes on two

14  occasions, and has turned over to the defense all

15  matters which the Court believes that the defense

16  is entitled to.

17                  MR. TINKER:  Do you mind if I ask the

18  Court a question?

19                  THE COURT:  I usually mind, but I'll

20  consider it.

21                  MR. TINKER:  Your Honor, did you --

22  just for the record, did you, in your opinion, turn

23  over any fan club records to the defense?

24                  THE COURT:  I think there's some

25  confusion about the differentiation between the fan
```

939

(C) S.Oballe 1995 -- All Rights Reserved

1    club and the Selena Etc.  That's really all I can

2    say.

3                    MR. TINKER:  Are there fan club

4    records that the Court has reviewed -- I'm not

5    going to ask you what they are -- that you have not

6    turned over to the defense?

7                    THE COURT:  Yes.

8                    Anything further?

9                    We'll be in recess until 1:00

10   o'clock.

11                   (Lunch recess -- 12:00 - 1:05 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

940

(C) S.Oballe 1995 -- All Rights Reserved

```
 1              THE COURT:  Please be seated.

 2              We're ready for the jury.

 3              MR. VALDEZ:  One minor thing before

 4  we start.  Are conferences here at the counsel

 5  table being recorded or sent downstairs,

 6  transmitted downstairs?

 7              THE COURT:  Yes.

 8              MR. VALDEZ:  They are?  Even our

 9  conferences, private conferences?

10              THE COURT:  I suggest you turn it

11  off.

12              MR. TINKER:  If you're embarrassed

13  about what you say.

14              Your Honor, may I address the Court?

15  I obtained copies of the records, it even still has

16  the folder that it came in from the Court,

17  reflecting what the records were that you did give

18  to us, and, for the record, Your Honor, I'd like it

19  to reflect it does -- even has the card from Joe

20  Castaneda, who was the investigator for the police

21  department.  Apparently, those had been obtained

22  from him and then you turned them over to us.  It

23  has, "from Judge Westergren."

24              THE COURT:  Well, some of those.

25              MR. TINKER:  It says, "from Judge
```

(C) S.Oballe 1995 -- All Rights Reserved

1    Westergren;" on the "Re: Embezzlement Charge;"

2    and those are the records that you gave me, and I'd

3    like the record to reflect what it is that we

4    received.

5              THE COURT:  Now, the confusion is

6    that the Court generated some of those from the

7    boxes that was provided in additional information

8    to Mr. Castaneda.

9              MR. TINKER:  For the record, Your

10   Honor, the only thing I received from the Court was

11   this.

12             THE COURT:  It may very well be.

13             MR. TINKER:  I just want the record

14   to reflect what it was, since it doesn't have any

15   fan club records in here.

16             THE COURT:  Again, the Court -- fine.

17             MR. TINKER:  And I would tender to

18   the Court -- and I don't know how we get them back

19   at some point in time; but can we have copies made

20   and return this to us for our use?

21             THE COURT:  Anything you can work

22   out.

23             MR. TINKER:  Can we have this called

24   Court's Exhibit 1?

25             THE COURT:  Yes.

945

(C) S.Oballe 1995 -- All Rights Reserved

1              Any objections?  This is not for the
2  jury.
3              MR. VALDEZ:  Your Honor, we don't
4  know what he's tendering.  We have no idea other
5  than what he's saying it is; we haven't looked at
6  it.  May we have some opportunity to examine the
7  records, Your Honor?
8              THE COURT:  If you feel you should.
9              MR. VALDEZ:  Yes, sir.  We would like
10  to look and see what he's offering.
11              THE COURT:  No.  No.  He's not
12  offering anything.
13              MR. VALDEZ:  Tendering.
14              MR. TINKER:  I'd like him to keep it
15  in order because that's the order I got them in.
16              MR. VALDEZ:  Your Honor, we don't
17  know how these would be relevant.  That's the only
18  objection we have.
19              THE COURT:  Counsel, they're not
20  being offered.
21              MR. VALDEZ:  Okay.  Judge, the
22  Court -- we ask that we have an objection.  That's
23  what we object to.  We don't know if there's any
24  issue that these would be relevant.
25              MR. TINKER:  The relevance is, Your

(C) S.Oballe 1995 -- All Rights Reserved

1    Honor, is to show what we did get; and the record
2    will clearly reflect what we didn't get.
3                    THE COURT:  This is purely for the
4    record.  Overruled.
5                    MR. TINKER:  And I would like copies
6    made.
7                    THE COURT:  All right.  Anything
8    else?  Are we ready for the jury?
9                    MR. TINKER:  Yes, Your Honor.
10                   I would like to understand what the
11   ruling is.  Is the Court going to permit him to say
12   he looked at records of the fan club and concluded
13   that there was theft going on?
14                   THE COURT:  What do you intend to do,
15   Counsel?
16                   MR. VALDEZ:  I'm going to ask him
17   about the meeting on the 9th of March and what
18   occurred at the meeting, and that's where we're
19   going to go.
20                   MR. TINKER:  If he's going to testify
21   at the meeting he told her he looked at the records
22   and concluded there was theft, I object to that,
23   because we don't get to cross-examine from the
24   records he claimed he used.
25                   MR. VALDEZ:  I don't intend to ask

                                                    947

(C) S.Oballe 1995 -- All Rights Reserved

1   him anything more about the records, just about the

2   meeting that occurred on March 9th and what

3   occurred at the meeting and go from there.

4                   THE COURT:  All right.

5                   Bring him in.

6                   Good afternoon, sir.

7                   All right.  Bring in the jury.

8                   Good afternoon, ladies and

9   gentlemen.  Please be seated.

10                  You may proceed with your questions.

11                  MR. VALDEZ:  Thank you, Your Honor.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

948

(C) S.Oballe 1995 -- All Rights Reserved

1   Suzette; and me and the defendant.

2   Q.   Yolanda Saldivar?

3   A.   Yes, sir.

4   Q.   And what happened at the meeting?

5   A.   Well, I showed her some documents that we

6   had -- that we had found.

7              MR. TINKER:  Your Honor, again, I'm

8   going to object, unless I'm going to be permitted

9   to see the documents that he claims he showed her.

10             THE COURT:  Overruled.

11  Q.   (By Mr. Valdez)  And what else happened?  What

12  did you do after that?

13  A.   I proceeded to question her about these

14  documents.

15  Q.   And what did you question her about?

16  A.   Who this Yvonne Peralez was.

17  Q.   And did the defendant have any answers?

18  A.   Her answer was, "I don't know."

19  Q.   Did you at that time make any threats to the

20  defendant, any physical threats?

21  A.   No, sir.

22  Q.   Did you make any other kind of threats?

23  A.   No, sir.

24  Q.   Did you tell her you were going to take any

25  type of action?

(C) S.Oballe 1995 -- All Rights Reserved.

1    A.   At the end of the meeting, I did.

2    Q.   What did you tell Yolanda Saldivar that night?

3    A.   I told her that I was going to go to the police

4    and make an investigation for embezzlement.

5    Q.   Excuse me?

6    A.   I told her that I was going to go in the

7    morning and proceed to make an investigation of

8    embezzlement.

9    Q.   And did the defendant answer you?  Did she have

10    any answers for you that night?

11    A.   No, sir.

12    Q.   What time did the meeting occur?

13    A.   It was set for, I think, around 8:00 o'clock,

14    but she showed up late.  She was one hour late.

15    She got there about 9:00 o'clock.

16    Q.   And this was on Thursday, March 9th?

17    A.   March the 9th.

18    Q.   Did you do anything else that night, you

19    yourself, with regards to the defendant, Yolanda

20    Saldivar?

21    A.   Well, just, I mean, we proceeded to question

22    her; me and my daughter Selena, and my other

23    daughter.

24    Q.   How long did the meeting last?

25    A.   Approximately around 30 minutes.

951

(C) S.Oballe 1995 -- All Rights Reserved

1    year, Thursday, March 9th.  On that day did you

2    have an opportunity to meet with Yolanda Saldivar?

3    A.  Yes, I did.

4    Q.  And where did that meeting occur?

5    A.  There at our Q Productions, off of Leopard.

6    Q.  Is there an office there?

7    A.  Yes.  Selena had a section of the building that

8    was for her sewing, and upstairs was an area like

9    an office.

10   Q.  And where exactly did the meeting occur?

11   A.  Upstairs in the office part.

12   Q.  Who was present at the meeting?

13   A.  Myself, Yolanda, Selena, and my father.

14   Q.  And what was the meeting about, Suzette?

15   A.  We had --

16   Q.  Go ahead.

17   A.  We had planned to move the fan club to Corpus

18   Christi, and Dad -- when all this happened, we got

19   the paperwork from San Antonio and none of the

20   papers were there, none of the bank statements,

21   nothing.

22                  MR. TINKER:  Your Honor --

23                  Excuse me, again.

24                  I object to this.  I filed a motion

25   concerning this.  I will continue my objection to

                                                        994

(C) S.Oballe 1995 -- All Rights Reserved

1  this kind of questioning.

2                THE COURT:   Overruled.

3  Q.  (By Mr. Valdez)   What happened at the meeting?

4  Tell the jury what happened.

5  A.  We sat down and Yolanda was quiet and Selena

6  just sat there and my dad started pointing out

7  things to Yolanda and asking her questions about

8  certain things, what we did have.

9  Q.  Did Yolanda have any answers for those

10  questions?

11  A.  No.  She just -- "Mr. Quintanilla, I -- I -- we

12  have records of that.  I don't know what happened

13  to them.  They were in the blue book."  And she

14  kept on saying that, and then he'd ask her about

15  something else and she didn't have an answer to

16  anything.

17  Q.  Did your dad, Mr. Quintanilla, threaten Yolanda

18  at any time during that meeting?

19  A.  No.

20  Q.  Did he threaten her with any physical violence?

21  A.  No.

22  Q.  Did he tell her he was going to take some kind

23  of action?

24  A.  Yes.  He said that he was going to pursue it

25  legally.

(C) S.Oballe 1995 -- All Rights Reserved

1    Q.   By doing what?

2    A.   I guess file it through the court, take it to

3    the hands of the law.

4    Q.   Was there any reaction from Yolanda Saldivar?

5    A.   No, not really.  She just looked like she

6    didn't have an answer to any of the questions.

7    Q.   And that happened on March 9th?

8    A.   It was a Thursday.

9    Q.   Do you remember what time the meeting was?

10   A.   I can't.  Around 8:00 or 9:00; it was already

11   dark outside.

12   Q.   What happened after the meeting, if anything?

13   What did you do?

14   A.   I got up and I got kind of close to Yolanda in

15   the face and I pointed to her and I told her that

16   she was a liar and she was a thief.

17   Q.   Did you threaten her at any time with physical

18   violence?

19   A.   No.  Never.

20   Q.   Did you see her after that?

21   A.   No, I did not.

22   Q.   Had you seen her before today in court?

23   A.   No.

24   Q.   Had you talked to her at all?

25   A.   No.

(C) S.Oballe 1995 -- All Rights Reserved

1              BE IT REMEMBERED that on the

2      21st day of December, 1995, the above entitled

3      and numbered cause came on for hearing before

4      the said Honorable Court, HONORABLE MIKE

5      WESTERGREN, Judge Presiding, and the following

6      proceedings were had:

7

8              THE COURT:  Please be seated.

9          Court calls for hearing in motion for

10     new trial.

11             MR. MCGUIRE:  Judge, I probably

12     oughta make a little statement, just to clarify

13     where we are, on the record.

14         On November 22nd, we prepared and

15     mailed to the 228th District Court, by

16     certified mail, an original motion for new

17     trial.  On that same date, we filed an

18     identical original with the 214th in

19     Corpus Christi.  The original motion that was

20     addressed to the 228th was apparently lost in

21     the mail.

22         On the 27th of November, which was

23     the deadline for filing a motion for new trial,

24     Miss Patricia Saum filed a notice of filing of

25     original affidavit of Clara Castro Sanchez, the

1    Defendant's Motion for New Trial, and filed as

2    an attachment to that a copy of the motion for

3    new trial, which we had made to the 228th

4    District Court.

5              So, I just wanted the record to

6    reflect where we were on the paperwork.

7                   THE COURT:  Duly noted.

8                   MR. MCGUIRE:  Okay.  If the

9    Court is ready, we would call Arnold Garcia, to

10   the stand, Your Honor.

11                  THE COURT:  Okay.  Is this a

12   factual matter?

13                  MR. MCGUIRE:  Yes, Your Honor.

14                  (Witness Sworn.)

15             Your Honor, before beginning the

16   questioning of Mr. Garcia, there are couple of

17   other matters that we have discussed with the

18   district attorney's office that we might take

19   care of.

20             Abraham Quintanilla, the father of

21   Selena, appeared on a Spanish television show,

22   Premire Impacto, on December 5th of 1995.  We

23   have a tape of that interview.  We, also, have

24   an English translation copy, of which we have

25   provided to the district attorney's office;

1    and it's my understanding that both sides are

2    agreeable to stipulating that the tape is an

3    accurate reproduction of the interview on

4    Premire Impacto, and that the -- the

5    translation is an accurate translation.

6               MR. SKURKA:  That's correct,

7    Judge.  Mr. Valdez viewed the tape -- not the

8    tape, but the program itself, and we've had the

9    transcript for a few days.  We don't doubt the

10   authenticity of it.

11              MR. MCGUIRE:  At this time,

12   then, Your Honor, we would offer, as

13   Defendant's Exhibits 1 and 2, the videotape and

14   the transcript.

15              THE COURT:  Admit.

16              MR. MCGUIRE:  Your Honor, the

17   purpose of this offer goes to the point that we

18   raised in the motion for new trial regarding

19   the discovery issue of the records which -- the

20   financial records of the Selena Fan Club.  It's

21   my understanding that, during the trial, those

22   records were sought by the defense, that

23   records were provided to the Court by

24   Mr. Quintanilla, and that there was a

25   representation made that there were no relevant

1    financial records pertaining to the Selena Fan

2    Club.

3              The tape of the interview which

4    occurred on December 5th is a tape of

5    Mr. Quintanilla discussing with the interviewer

6    financial records which he claimed supported

7    his allegation that embezzlement was being done

8    by Miss Saldivar.  It's our position in this

9    case that, because of the failure of

10   Mr. Quintanilla and the state to reveal those

11   records to defense, that defense was prevented

12   from being able to adequately represent

13   Miss Saldivar, in that they had no way of

14   knowing in advance what sort of evidence, if

15   any, existed regarding the embezzlement issue.

16   As a result of that, they altered their trial

17   strategy and were not able to place her on the

18   stand, because they did not know with what they

19   would be confronted, if they did that.  So

20   that's the issue that that relates to.

21              The second thing, that we would like

22   to --

23              THE COURT:  Just a moment.  Let

24   me see that transcript.

25              (Handed to the Court.)

1    Q.   You didn't call me and talk to me and

2    said, "Well, look, they're gonna revoke my

3    probation if I testify?"

4    A.   No.

5                    MR. TINKER:  I pass the witness.

6                    MR. SKURKA:  I don't think we

7    have any other questions, Judge.  We'll pass

8    the witness, also.

9                    THE COURT:  You may step down.

10                   THE WITNESS:  Thank you.

11                   MR. SKURKA:  We have no other

12   witness, Your Honor.

13                   MR. MCGUIRE:  We rest.

14                   THE COURT:  All right.  And

15   that's all the evidence.

16                   MR. SKURKA:  Yes, sir.

17                   THE COURT:  All right.  You wish

18   to argue?

19                   MR. MCGUIRE:  Your Honor, in the

20   motion for new trial, we have raised two points

21   that I'd like to address in argument.

22                   The first has that do with the denial

23   of the right of the defendant to effective

24   assistance of counsel and a confrontation of

25   witnesses by the failure of the state to allow

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

CYNTHIA MOTAL, CSR, RPR                    108