1   the discovery of the financial records from the

2   Selena Fan Club, which have been shown by this

3   tape, which we have introduced as Defendant's

4   Exhibit 1, to exist and to exist for several

5   months.

6           The failure to provide that

7   information had a profound affect on the

8   presentation of this case, in that it caused

9   the defense to not know what they might be

10  faced with in the event that they placed the

11  defendant on the stand.  We feel that the

12  subsequent discovery of the existence of this

13  material warrants the Court's consideration of

14  our motion for new trial, so that this lady can

15  examine what it is that they claim to have

16  against her byway of extraneous offenses and

17  answer those charges and be allowed to take the

18  stand in her own defense, if she chooses to do

19  so, and knowing all the while what it is that

20  she's being faced with.

21          The second point that I would like to

22  address in argument is the matter of the

23  criminal records of the Witness Martinez.

24  That, again, has resulted in the denial of due

25  process and effective assistance of counsel by

1    hiding, that is not completely resolved yet.

2                    MR. TINKER:  Well, Your Honor, they, at

3    least I'm --

4                    THE COURT:  Someone may be not making

5    them available, I think is a better way to characterize

6    it.

7                    MR. TINKER:  404(b) --

8                    THE COURT:  But let me remind you, this

9    Court has not fully resolved that issue.  That's still

10   before the Court.

11                   MR. TINKER:  404(b) requires them --

12   first, I say:  That's an extraneous offense.  They are

13   going to say I'm an embezzler when I'm being tried for

14   murder -- that's an extraneous offense.  404(b) says that

15   they are required to tell us when, where and how it

16   happened, and the Harrell case, which I cited in my

17   motion, 884 SW 2d at 154 says that there has to be a

18   hearing outside the presence of the jury, and they have to

19   convince Your Honor beyond a reasonable doubt that the

20   accusation in this case of the embezzlement is true before

21   you permit the jury to hear it.  It does not have to be a

22   conviction, but you have to become convinced that it is a

23   true allegation.  And in addition to that, you have to

24   decide whether or not the relevance, if it is relevant,

25   outweighs the harm that is done by introducing this

1            MR. TINKER:  Oh, you're talking about

2    those records?  Is that what you're referring to?

3            THE COURT:  Yes.

4            MR. TINKER:  What kind of stamp?

5            THE COURT:  Bates stamp.  That's civil

6    law stuff.  But you know what --

7            MR. TINKER:  I, not only I don't know

8    it, but I have never been accused of knowing it.

9            THE COURT:  Well, for everybody's

10   information, those, in civil cases, they're just a

11   numerical pagination on any scrap of paper that is given,

12   so that you have something to refer to.

13           MR. TINKER:  Your Honor, I just noticed

14   that defendant's motion over here, to suppress statement,

15   that's already been denied.  I'll make a note.

16           THE COURT:  All right.

17           MR. TINKER:  Your Honor, I have the

18   Defendant's Motion for Preliminary Determination of

19   Extraneous Offenses, and it speaks, for the Court, to

20   itself.

21           I also have a 404(b) motion that requires

22   them to notify me on demand.  Not only do I have a 404(b)

23   motion, I sent a certified letter to their office

24   requesting that.  That's --

25           THE COURT:  Well, I think -- let me

1  interrupt you a moment.  I think our first question here

2  is to define what we mean by "extraneous offense," and I

3  guess I'm going to have to do that ultimately, but I'll

4  certainly hear you all's views on that.

5              MR. VALDEZ:  Very good point, Judge.  I

6  don't think we have any extraneous offenses and, by that,

7  I mean any criminal convictions that we plan to introduce.

8              There are -- there is going to be some

9  evidence introduced about the fact that Mr. Quintanilla

10  thought that the defendant was embezzling funds from him.

11  Now, there is a difference there, Judge, between thinking

12  somebody is doing it and somebody actually doing it.

13  There won't be any evidence introduced -- at least not

14  from the State -- about any funds being embezzled or

15  anything like that.  Now, Mr. Tinker may go into that;

16  that seems like what he wants to do.  But our position is

17  going to be that we're going to introduce evidence that

18  Mr. Quintanilla thought that the defendant was embezzling

19  funds and confronted her about that.

20              THE COURT:  Well, why is that relevant

21  in your case in chief?

22              MR. VALDEZ:  It goes to motive, Judge,

23  and if --

24              THE COURT:  What he thinks goes to

25  motive?

1          MR. VALDEZ:  Well, not just what he

2    thinks; what he did after he formed this thought process.

3          THE COURT:  Okay.  All right.

4          MR. VALDEZ:  Because there was a --

5          THE COURT:  So you're claiming it's

6    just part of the res gestae of the case?

7          MR. VALDEZ:  The motive leading up to

8    the shooting; yes, sir.

9          MR. TINKER:  Your Honor, that's an

10   extraneous offense.  No question about it.

11         MR. VALDEZ:  No, there is a very big

12   question about it.  It's a --

13         THE COURT:  Well, he is talking now.

14         MR. TINKER:  If somebody says to a jury

15   that is trying me for murder, and says that I'm also an

16   embezzler, that's my belief, that's introducing an

17   extraneous crime.  Now, whether the jury believes it is

18   another question, but what the prosecution is trying to do

19   is, they're trying to let that witness testify that he

20   believes that my client is an embezzler, but they are

21   hiding the records which will help us prove that that's

22   not so.  They can't have it both ways.  They cannot have

23   it both ways.

24         Secondly, again, why is it admissible?

25         THE COURT:  When you say they're

8   5   6

IS ON REC. EX. # 25

1   extraneous matter.  And that's what the Harrell case says,

2   and that's what I'm requesting from the Court.

3                    THE COURT:  Did the State have a chance

4   to brief this?

5                    MR. VALDEZ:  I don't have a brief,

6   Judge, but I do have the case, the Moreno case from the

7   Court of Criminal Appeals.

8                    THE COURT:  Okay.

9                    MR. VALDEZ:  That's the capital murder

10  case in which the state introduced -- I'm sorry; the cite

11  is --

12                   THE COURT:  Well, now, Counsel, when

13  you say "capital murder case," that puts up a big red flag

14  because, as you know, those cases are different on this

15  issue.

16                   MR. VALDEZ:  Well, not exactly the way

17  we're doing the issue, Judge.

18                   THE COURT:  Well, that's the way the

19  Court views it.

20                   MR. VALDEZ:  Can I tell you --

21                   THE COURT:  You'd better get something

22  other than a capital murder case.

23                   MR. VALDEZ:  -- what the case says?

24                   THE COURT:  You can tell me, but the

25  Court knows from trying capital murder cases that just

1    about anything can come in, in a capital murder case.

2                    MS. STERLING:  On punishment.

3                    MR. VALDEZ:  On punishment, Judge.

4    This is on guilt-innocence.

5                    THE COURT:  Okay.  Well, I will hear

6    it.

7                    MR. VALDEZ:  And what the State was

8    trying to introduce, the case involved a kidnapping and

9    murder, and there was some evidence that the defendant had

10   told police officers that he had thought about kidnapping

11   somebody else.  The State introduced that evidence, that

12   the defendant thought about killing somebody else.  Well,

13   the defense objected, saying that's an extraneous offense

14   that they hadn't told the defense about.

15                    The Court said:  No, it's not.  Thoughts are

16   never extraneous offenses.  You have to have an overt act

17   and possibly also a conviction before it can be an

18   extraneous offense.  Thinking about it, like we're saying

19   here this case, it's not an extraneous offense.  It's just

20   that:  A thought.

21                    The decision was written by Sam Houston

22   Clinton, Judge, and it's a decision out of the Court of

23   Criminal Appeals.  So I think that goes exactly to the

24   point that I'm talking about.

25                    THE COURT:  I will consider that.  Did

1  you bring it?

2                    MR. VALDEZ:  I don't have a copy for

3  Mr. Tinker, but I'd make one available.

4                    THE COURT:  All you have to do is give

5  him the cite.

6                    MR. VALDEZ:  It's 858 Southwest 2d 453.

7                    MR. TINKER:  Your Honor, what year was

8  that written?

9                    MS. STERLING:  1993.

10                    MR. TINKER:  Your Honor, I have a case,

11  which is not a capital murder case -- it's Harrell, and I

12  have got a copy for counsel -- and it just says:  Standard

13  admissibility of extraneous offense evidence is proof

14  beyond a reasonable doubt.  And, two, the trial court must

15  determine that the jury may find beyond a reasonable doubt

16  that the defendant committed extraneous offenses before

17  admitting the evidence -- before admitting the evidence.

18                  That's what it says.

19                    THE COURT:  Let me see those cases.

20  And I think we'll just quit right now.  I will read these

21  and I will give you a ruling when we get back.

22                    MR. TINKER:  When will we be back,

23  Judge?

24                    MR. VALDEZ:  2:00?

25                    THE COURT:  Can we finish today?

1          MR. TINKER:  Yes, I believe we can,

2   Your Honor.

3          THE COURT:  All right.  Recess.

4          All right, on the issue where we're going I'm

5   going to be working on that through the noon hour, and

6   then we'll probably have an announcement.

7

8          (Noon recess.)

9

10         (Proceedings resumed as follows with all
           parties present and represented as before
11         the noon recess.)

12         THE COURT:  Okay.  A little unfinished

13  business.  First of all, I have read the cases and I will,

14  I agree with the State that they can get in the kinds of

15  evidence they're talking about at this point.

16         MR. TINKER:  Concerning what issue?

17         THE COURT:  Concerning the issue of the

18  alleged --

19         MR. TINKER:  Extraneous matters.

20         THE COURT:  That's your

21  characterization.  The business about the belief of

22  embezzlement.

23         MR. TINKER:  Well, in that regard, Your

24  Honor, if the Court is going to permit that, it's my

25  position that -- and we'll go into the records -- but

1          MR. TINKER:  He can say yes or no to

2    the first question.

3          THE COURT:  That's correct.

4    Q.  (By Mr. Valdez)  Now, as a result of what you

5    found out, did you do something?

6    A.  Can you repeat the question?

7    Q.  As a result of the information you received,

8    did you do anything?

9    A.  Yes, sir.

10   Q.  What did you do?

11   A.  I had called Yolanda, and confronted her with

12   this.

13   Q.  When was that?

14   A.  It was the latter part of January of this year.

15   Q.  And what did you ask her?

16   A.  I asked her why all of a sudden I'm getting a

17   lot of phone calls and letters from mothers

18   claiming that their children had sent in the annual

19   fee and were not getting their packages.

20   Q.  What was her response?

21   A.  She said that they were lying, that they only

22   wanted a second package for free.

23   Q.  So did you do any further investigation?

24   A.  I did.

25   Q.  And, as a result of that investigation, did you

912

(C) S.Oballe 1995 -- All Rights Reserved

```
 1   do anything?

 2   A.   Yes, I did.

 3   Q.   What did you do?

 4   A.   I went to San Antonio and I recovered all

 5   the --

 6                MR. TINKER:   Your Honor, may we

 7   approach the bench?

 8                (Discussion at the bench.)

 9                MR. TINKER:   Your Honor, we attempted

10   to discover these records, we were prohibited from

11   doing so.

12                Well, you gave us records; but

13   they're not these fan club records that he

14   obtained.

15                They filed a motion to suppress.  All

16   we got was what the District Attorney's Office had,

17   not what this witness had.  At the time, counsel

18   said we're just going to ask him if he suspected

19   embezzlement, he said.  They're going into details

20   of this and we don't have any records to look at.

21   We tried to find them ahead of time.

22                MR. VALDEZ:   I haven't asked him

23   anything about records.

24                MR. TINKER:   Well, he just asked

25   him:  Did you go?  And he said he went and got
```

(C) S.Oballe 1995 -- All Rights Reserved

1  records.  And I'm saying that we tried to discover

2  these and have not been able to do so.

3          THE COURT:  At this time, I don't

4  sustain the objection to this line of questioning,

5  but any details about it I would.

6  Q.  (By Mr. Valdez)  Mr. Quintanilla, as a result

7  of your further investigation in this matter, did

8  you form an opinion or form any suspicions about

9  the activities of Yolanda Saldivar?

10  A.  I did.

11  Q.  What were -- what was that opinion or

12  suspicion?

13  A.  That she was taking money from the fan club.

14  Q.  And did you take any action after that, after

15  you formed this suspicion?

16  A.  I talked to her and told her that I wanted to

17  bring all the records to our office.  And that from

18  this point on that we were going to run the fan

19  club through our office, because Selena's image was

20  being tarnished because people were blaming her.

21  Q.  Did you talk to her in person or on the phone?

22  A.  In person, there in our office.

23  Q.  Do you remember when that meeting occurred?

24  A.  You're talking about the first -- the very --

25  Q.  The meeting that you're talking about, when you

914

(C) S.Oballe 1995 -- All Rights Reserved

1  A.  Well, I had recovered the records for the fan

2  club, and we found proof that she was stealing.

3              MR. TINKER:  Your Honor --

4              Excuse me.

5              I object to this.  He's now

6  testifying about the records that we've been trying

7  to get him to show us at this time.

8              THE COURT:  I'm going to sustain the

9  objection, for now.

10             MR. TINKER:  I request that the jury

11 be instructed to disregard.  If we can't see those

12 records, he shouldn't be testifying about them.

13             THE COURT:  That is my instruction,

14 for now.  We'll have a hearing on this matter.

15             As a matter of fact, members of the

16 jury, I think we'll dismiss you at this time.  And

17 have a nice lunch, and we'll see you back here at

18 1:00 o'clock.

19             (Jury released to jury room -

20 11:30 a.m.)

21             MR. TINKER:  Are we still in session,

22 Your Honor?

23             THE COURT:  Yes, we are.  You may

24 proceed.

25             MR. TINKER:  Well, when you're

(C) S.Oballe 1995 -- All Rights Reserved

1    Suzette; and me and the defendant.

2    Q.   Yolanda Saldivar?

3    A.   Yes, sir.

4    Q.   And what happened at the meeting?

5    A.   Well, I showed her some documents that we

6    had -- that we had found.

7                    MR. TINKER:  Your Honor, again, I'm

8    going to object, unless I'm going to be permitted

9    to see the documents that he claims he showed her.

10                    THE COURT:  Overruled.

11   Q.   (By Mr. Valdez)  And what else happened?  What

12   did you do after that?

13   A.   I proceeded to question her about these

14   documents.

15   Q.   And what did you question her about?

16   A.   Who this Yvonne Peralez was.

17   Q.   And did the defendant have any answers?

18   A.   Her answer was, "I don't know."

19   Q.   Did you at that time make any threats to the

20   defendant, any physical threats?

21   A.   No, sir.

22   Q.   Did you make any other kind of threats?

23   A.   No, sir.

24   Q.   Did you tell her you were going to take any

25   type of action?

(C) S.Oballe 1995 -- All Rights Reserved

1  A.  At the end of the meeting, I did.

2  Q.  What did you tell Yolanda Saldivar that night?

3  A.  I told her that I was going to go to the police

4  and make an investigation for embezzlement.

5  Q.  Excuse me?

6  A.  I told her that I was going to go in the

7  morning and proceed to make an investigation of

8  embezzlement.

9  Q.  And did the defendant answer you?  Did she have

10  any answers for you that night?

11  A.  No, sir.

12  Q.  What time did the meeting occur?

13  A.  It was set for, I think, around 8:00 o'clock,

14  but she showed up late.  She was one hour late.

15  She got there about 9:00 o'clock.

16  Q.  And this was on Thursday, March 9th?

17  A.  March the 9th.

18  Q.  Did you do anything else that night, you

19  yourself, with regards to the defendant, Yolanda

20  Saldivar?

21  A.  Well, just, I mean, we proceeded to question

22  her; me and my daughter Selena, and my other

23  daughter.

24  Q.  How long did the meeting last?

25  A.  Approximately around 30 minutes.

951

(C) S.Oballe 1995 -- All Rights Reserved

1    Q.   By doing what?

2    A.   I guess file it through the court, take it to

3    the hands of the law.

4    Q.   Was there any reaction from Yolanda Saldivar?

5    A.   No, not really.  She just looked like she

6    didn't have an answer to any of the questions.

7    Q.   And that happened on March 9th?

8    A.   It was a Thursday.

9    Q.   Do you remember what time the meeting was?

10   A.   I can't.  Around 8:00 or 9:00; it was already

11   dark outside.

12   Q.   What happened after the meeting, if anything?

13   What did you do?

14   A.   I got up and I got kind of close to Yolanda in

15   the face and I pointed to her and I told her that

16   she was a liar and she was a thief.

17   Q.   Did you threaten her at any time with physical

18   violence?

19   A.   No.  Never.

20   Q.   Did you see her after that?

21   A.   No, I did not.

22   Q.   Had you seen her before today in court?

23   A.   No.

24   Q.   Had you talked to her at all?

25   A.   No.

996

(C) S.Oballe 1995 -- All Rights Reserved

1    basis?

2    A.  Oh, yeah.  Yes.

3    Q.  Now, how involved was Yolanda Saldivar in

4    helping Selena run the business, if she was?

5    A.  She was pretty involved.  She was on the

6    account, she could write checks for -- she had her

7    own checks with, you know, she had the -- how would

8    you say -- she needed to withdraw money or deposit

9    money, she, you know, she had that much freedom, I

10   guess you would say, or, you know.

11   Q.  Did she have authority to withdraw funds

12   whenever she wanted to?

13   A.  Yes.

14   Q.  Did she have authority to write checks?

15   A.  Yes.

16   Q.  Did she have any credit cards?

17   A.  Yes, she did.

18   Q.  And would she use those?

19   A.  Yes.

20   Q.  Was she on all the checking accounts that the

21   business had as a signatory?

22   A.  Having to do with the business, yes.

23   Q.  She was?

24   A.  Having to do with the business, yes.

25   Q.  Did you remove Yolanda Saldivar from the

(C) S.Oballe 1995 -- All Rights Reserved

```
 1   checking accounts --
 2   A.   Yes, we did.
 3   Q.   -- at any time?
 4   A.   Yes, we did.
 5   Q.   Do you remember when that was, Mr. Perez?
 6   A.   The exact date, no.  I remember going to the
 7   bank and doing it, Selena and I.
 8   Q.   Do you remember the approximate date?
 9   A.   I believe it was in April, maybe March, the end
10   of April, beginning of March, somewhere around in
11   there, or the middle of March.
12   Q.   Middle of March?
13   A.   The middle of March.
14   Q.   Was it while Selena was still alive?
15   A.   Yes.  We both went to the bank to do it.
16   Q.   And why did you do that, Mr. Perez?
17                MR. TINKER:  Your Honor, I'm going to
18   object to that.  It calls for hearsay.
19                THE COURT: ·Overruled.
20                MR. VALDEZ:  He's a direct witness,
21   Your Honor, it doesn't call for hearsay.  It calls
22   for the reason why he removed the defendant from
23   the checking account.
24                THE COURT:  Overruled.
25   A.   Selena and I didn't trust her.
```

972

(C) S.Oballe 1995 -- All Rights Reserved

```
 1    Q.   Had you threatened her in any way?

 2    A.   Never.

 3    Q.   Had you hired anybody to threaten her?

 4    A.   Never.

 5    Q.   Why did you confront Yolanda at that meeting,

 6    Thursday night, March the 9th?

 7    A.   I don't understand your question.

 8    Q.   Why did you -- you said you got in her face.

 9    Why did you do that?

10    A.   Because I know that she was lying.

11    Q.   Did you talk to Selena after that meeting that

12    night?

13    A.   No.  She was recording that night and I wasn't

14    able to talk to her.

15    Q.   Do you know whether or not Yolanda was fired?

16                 MR. TINKER:  Your Honor, again calls

17    for hearsay and I object to it.

18                 THE COURT:  Overruled.

19                 MR. TINKER:  I'd like to ask her if

20    she was present if that occurred.

21                 THE COURT:  I overrule the objection.

22    Q.   (By Mr. Valdez)  Do you know whether or not she

23    was fired?

24    A.   That night?

25    Q.   No.  At any time?
```

997

(C) S.Oballe 1995 -- All Rights Reserved

1   A.   Yes.

2   Q.   Did you talk to Selena at any time after that?

3   A.   Yes.

4   Q.   When was that?

5   A.   Oh, about a week or two after the meeting, on a

6   Saturday.

7   Q.   Is that the Saturday before she was killed?

8   A.   Yes, it was.

9   Q.   Where did you talk to Selena?

10  A.   At my home.

11  Q.   And what was that conversation about?

12               MR. TINKER:   Your Honor, I object to

13  that unless -- I know that Your Honor is making

14  rulings on this; but if he's claiming it's not for

15  the truth of the matter, I would request the jury

16  be instructed that that's true.   It is hearsay.

17               MR. VALDEZ:   This is an exception to

18  the hearsay rule under 8033, Your Honor; emotional,

19  mental and physical, emotional intent or plans by

20  Selena.

21               MR. TINKER:   Your Honor, that rule

22  does not apply in this case.   It is hearsay, I

23  object to it.   Secondly, if they're offering it not

24  for the truth of the matter, I want an instruction

25  to the jury in that regard.   So I ask --

998

(C) S.Oballe 1995 -- All Rights Reserved

1              THE COURT:  Why is it not a

2    exception?

3              MR. TINKER:  I'd rather take this up

4    outside the presence of the jury.

5              THE COURT:  All right.

6              Actually, members of the jury, I need

7    to take a break, so we'll just go on break and you

8    can be gone up to 20 minutes, but you don't want to

9    go longer than that.

10             (Recess -- 2:10 - 2:30 p.m.)

11             THE COURT:  You want to summarize?

12             MR. TINKER:  Just that counsel has

13   said there's exception to the hearsay.  What I

14   don't recall is whether he was saying that he

15   agrees that it's not offered for the truth of the

16   matter.  Has he agreed with that part of it?

17             THE COURT:  Yes.

18             MS. STERLING:  No.

19             MR. VALDEZ:  That it is.  That it is

20   for the truth.

21             MS. STERLING:  Correct.  We don't

22   agree that it's not.

23             THE COURT:  The Court was momentarily

24   misunderstanding.

25             MR. TINKER:  It's clearly a hearsay

999

(C) S.Oballe 1995 -- All Rights Reserved

1  statement of Selena.  Selena's not here for us to

2  cross-examine.  It is not a present sense about the

3  offense itself, which is when that rule can come

4  into play.  Going to fire doesn't have anything to

5  do with the shooting and I object.  We can't

6  cross-examine Selena, she's not here, she's not

7  available as a witness.

8              THE COURT:  The Court believes it is

9  an exception.  Did you look at my book?

10             MS. SAUM:  No.  I didn't look up

11 there.

12             THE COURT:  Does someone have a copy

13 of the rules?

14             MR. TINKER:  We have a copy of the

15 rules.

16             MS. SAUM:  I just don't know where

17 that blue book is.

18             THE COURT:  What's the rule you're

19 relying on?

20             MR. VALDEZ:  8033, Your Honor.  The

21 declarence then existing --

22             THE COURT:  I'm reading it.  I'll

23 stand by that rule.

24             You may proceed.

25             MR. TINKER:  I'd just like to add one

1000

(C) S.Oballe 1995 -- All Rights Reserved

```
 1   thing.  Counsel's suggestion, saying I'm going to
 2   fire Selena is not a statement of state of mind,
 3   it's a statement of what she's going to do.  That's
 4   not saying -- the state of mind is:  I was fearful,
 5   I was frightened, those kinds of things.
 6                   MR. VALDEZ:  Intent.
 7                   THE COURT:  Well, under the rule I'm
 8   going to overrule it.
 9                   All right.  We ready for the jury?
10                   MR. TINKER:  Yes, Your Honor.
11                   THE COURT:  Please, be seated.
12                   MR. VALDEZ:  Your Honor, before we
13   begin, may we approach the bench?
14                   THE COURT:  All right.
15                   (Discussion at the bench.)
16                   MR. VALDEZ:  After this witness we've
17   got two other witnesses available and we just
18   wanted to let the Court know for purposes of
19   scheduling we don't have any other people here.
20                   THE COURT:  That's fine.  Go with
21   anything you can.
22                   MR. VALDEZ:  All right.
23                   THE COURT:  All right.
24                   MR. TINKER:  May I approach the
25   bench, Your Honor?
```

(C) S.Oballe 1995 -- All Rights Reserved

```
 1                    THE COURT:  Yes.
 2                    (Mr. Tinker hands the Court some
 3  papers.)
 4                    THE COURT:  All right.
 5                    You may proceed.
 6  Q.  (By Mr. Valdez)  Suzette, do you realize you're
 7  still under oath?
 8  A.  Yes, I do.
 9  Q.  You were telling us before we broke about
10  talking to Selena the Saturday before she was
11  killed?
12  A.  Yes.
13  Q.  And where did you talk to her?
14  A.  At my home.
15  Q.  And did she tell you what she was planning to
16  do?
17  A.  Yes.
18  Q.  With the business, as far as the business is
19  concerned?
20  A.  Yes.
21  Q.  Did she tell you what she was planning to do as
22  far as Yolanda Saldivar?
23  A.  Yes.
24  Q.  What did she tell you?
25  A.  She said that she was going to fire Yolanda
```

1002

(C) S.Oballe 1995 -- All Rights Reserved

1  because she thought she was embezzling from her

2  company.

3  Q.  Do you know whether or not Yolanda Saldivar was

4  working for Selena on March 9th when you had that

5  meeting?

6  A.  I don't know that.

7  Q.  Do you remember March 9th, the Thursday when

8  you had the meeting at Q Productions?

9  A.  Yes.

10  Q.  Was Yolanda an employee of Selena on that day?

11  A.  I believe so, I'm not too sure.

12  Q.  If she was an employee, was she a full-time

13  employee?

14  A.  I don't know.

15           MR. TINKER:  Your Honor, if she

16  doesn't know -- she says she doesn't know, and I

17  object to him trying to get her to answer the

18  question.

19           THE COURT:  Sustained.

20  Q.  (By Mr. Valdez)  Do you know whether or not

21  Yolanda Saldivar had another job at that time?

22  A.  No.  She did not have another job.

23  Q.  Where were you when you first heard that Selena

24  had been killed?

25  A.  At my home.

1003

(C) S.Oballe 1995 -- All Rights Reserved

1                    (Start time - 8:40 a.m.)

2                    THE COURT:  All right.  Gentlemen, we

3   ready for the jury?

4                    MR. TINKER:  Your Honor, I have a

5   couple of matters.  I actually just did some

6   research concerning the issue in the hearsay

7   question and I have a case, which in my view,

8   supports our position that hearsay statements that

9   have been coming in under 803 are not admissible

10  under the case of Norton vs. State, 771, S.W. 2d.,

11  160.  I'd like to tender those to the Court.  I

12  have highlighted Page 165, Your Honor.

13                   THE COURT:  Thank you.

14                   Anything further?

15                   MR. TINKER:  Yes, I do, Your Honor.

16  It's my understanding that the prosecution has

17  brought a person to be a witness called Debra

18  Ramirez.  I know in her statement she makes

19  statements like, "I didn't trust Yolanda."  That's

20  character traits, it's not an issue in this crime.

21  I'm going to object to that and request the

22  prosecutor be instructed for this witness or any

23  other witness whether they did or did not trust

24  Yolanda.  It's again not appropriate, particularly

25  that reflects on traits of character and opinion,

1099
(C) S.Oballe 1995 -- All Rights Reserved

1    that part.  It's certainly inconsistent with the

2    position they take here.

3              THE COURT:  Gentlemen and lady, it

4    appears to be exactly the same kind of testimony,

5    so I will conclude later this issue if you wish to

6    argue but for now bring in the jury.

7              MR. TINKER:  Your Honor, excuse me.

8    Could I address the Court briefly?  You did sustain

9    the objection at this point?

10             THE COURT:  That's correct.

11             MR. TINKER:  Your Honor, yesterday

12   before we were able to take up all this, we

13   continue to object to statements just like this

14   from other witnesses.  So I request that at some

15   point in time that you instruct the jury to

16   disregard.  And we may have to go back over and

17   make notes about exactly what it was to disregard

18   the testimony of others that were permitted to

19   testify over our objections.

20             THE COURT:  I don't necessarily agree

21   with your evaluation.

22             MR. TINKER:  I request, Your Honor --

23             THE COURT:  I understand the request,

24   but it's overruled.

25             MR. TINKER:  I request that you

1148

(C) S.Oballe 1995 -- All Rights Reserved

1   instruct them to disregard any statement by any

2   other witness in which they testified she was going

3   to go over there -- Selena said she was going to go

4   over there and fire Yolanda.

5                    THE COURT:  Overruled.

6                    All right bring in the jury.

7                    Please be seated.

8   Q.   (By Ms. Sterling)  So what time did Selena

9   leave the boutique that night?

10  A.   Around 8:30.

11  Q.   And is that the last time you saw her?

12  A.   That night I followed her home.

13  Q.   I'm sorry?

14  A.   I followed her home.

15  Q.   You followed her home?  Why did you do that?

16  A.   I just wanted to make sure she got home okay.

17  Q.   Were you worried about her?

18  A.   Yes.

19                    MR. TINKER:  Excuse me.

20                    Your Honor, she responded to the

21  question and then counsel suggested an additional

22  answer.  I object to that.  It's leading.

23                    THE COURT:  Overruled.

24  Q.   (By Ms. Sterling)  Were you worried about her?

25  A.   Yes, I was.

(C) S.Oballe 1995 -- All Rights Reserved

1    Exhibits; the tapes, the log that are on that one

2    pad, and then the notes that were created by those

3    assisting Mr. Young and Mr. Valencia during the

4    negotiations of Yolanda Saldivar.  And my

5    recollection is I had an objection.  I had no

6    objection to the custodial capacity as far as

7    Exhibit 15 was concerned, but I informed the Court

8    that I did object to the contents of 15.  That's my

9    recollection, and I would think it would be

10   appropriate that if the jury is going to go eat

11   lunch or whatever they're going to see, if we

12   couldn't find that in the record before you permit

13   that to go to the jury.

14          MR. SKURKA:  I don't have it in my

15   notes that he made that objection, but I don't have

16   a problem with the court reporter finding that part

17   and making sure that's what it said.

18          THE COURT:  Sure.

19          MR. TINKER:  Again, also with regard

20   to the Exhibit that Counsel referred to in his

21   testimony about there was a letter that was

22   asked that said they hadn't got her money, that

23   some fan hadn't gotten their money, that's just

24   exactly the kind of thing that interjects

25   extraneous matters in this case that are contained

3055

(C) S.Oballe 1995 -- All Rights Reserved

1   in some of these Exhibits.  That's exactly the kind

2   of reason that I say all of these should not go to

3   the jury.  With regard to that specific one of

4   Counsel knows where it is, I ask him to take it

5   out.

6            MR. SKURKA:  Well, that's the one

7   that corroborated what Abe Quintanilla said that he

8   had been getting complaints.

9            MR. TINKER:  Well, there's no sponsor

10  to it, and that's the problem with it.  They

11  introduced this but without any testimony

12  concerning it.

13           THE COURT:  All right.  We'll look at

14  the record and discuss this matter.  They have to,

15  according to the Codes of Criminal Procedure,

16  request Exhibits.

17           MR. TINKER:  And there are Exhibits

18  that they said they've taken out, and I guess --

19           THE COURT:  Those need to be put in

20  an envelope.

21           MR. SKURKA:  Yeah.  That's the one in

22  the top corner?  I just didn't have an envelope to

23  put them in.

24           MR. TINKER:  I just want to get them

25  out this.

3056

(C) S.Oballe 1995 -- All Rights Reserved

1        MR. SKURKA:  Judge, Mr. Valdez and I

2   have looked at State's Exhibit 15, and we don't

3   mind, we'll just withdraw that so that will take

4   care of the objection for it going to the jury.

5        THE COURT:  And what about the

6   briefcase?

7        MR. TINKER:  Well, they have, with

8   regard to -- we ought to have the Exhibit here.

9   With regard to Exhibit 122, Your Honor, I object to

10  any of the contents.  They have excluded some

11  items, there are some stacks of letters that are

12  unexplained documents, bank records.  There have

13  been no sponsoring witnesses, it just happened to

14  be something that was in the truck, it's not

15  explained by anybody, and, just, you don't know

16  what the jury will do with it if they get it.

17  That's why I object to it.

18        THE COURT:  Response?

19        MR. SKURKA:  Okay.  Our position is

20  the evidence, the contents of the briefcase marked

21  122 are relevant for the following reasons:

22  Testimony adduced at trial was that the deceased

23  and her husband were trying to retrieve records of

24  their businesses before they terminated this

25  employee.  The testimony also shows that this

3058

(C) S.Oballe 1995 -- All Rights Reserved

1    briefcase was located in the defendant's truck, and

2    if the Court looks at the contents of the briefcase

3    itself, you'll see that there's every kind of

4    connection with Selena Quintanilla Perez and her

5    husband, Chris, and all their businesses and bank

6    records, financial statements, invoices, orders,

7    stuff like that, all those records that she wanted.

8                THE COURT:  For now, why don't you

9    bring me everything that you think is relevant and

10   admissible?

11               MR. SKURKA:  For the record, Your

12   Honor, that day that we first admitted this or

13   introduced this the Court asked us to go back and

14   pull stuff out of there that we weren't contesting

15   the relevancy.  The stuff that we left is all

16   marked with Selena's business expenses, stuff

17   marked Selena Etc.

18               THE COURT:  Okay.  I see your notes.

19               MR. SKURKA:  There's also insurance

20   records, tax stuff, all concerning the victim, and

21   her personal bank account, too, I think.

22               THE COURT:  Why is this register in

23   there?

24               MR. SKURKA:  Because it's addressed

25   to Selena Etc.  They were trying to register her

3059

(C) S.Oballe 1995 -- All Rights Reserved

1   for some kind of thing.  It's addressed to Selena

2   or Selena Etc., I believe.

3                   THE COURT:  Okay.  We've received our

4   first note.

5                   First question:  Eleven copies of the

6   charge, all prosecution evidence, all defense

7   evidence.

8                   We will comply with that, but I'm

9   still working on the evidence.

10                  MR. TINKER:  Your Honor, I object to

11  sending any prosecution evidence in there.

12                  THE COURT:  Okay.  That's noted.

13                  All right.  Let's have order.  The

14  final question on this briefcase, Exhibit No. 122.

15  The Court has reviewed the contents and believes

16  that it's admissible.

17                  MR. TINKER:  Admissible?

18                  THE COURT:  Yeah.

19                  MR. TINKER:  Your Honor, just let the

20  record reflect I object to it.

21                  THE COURT:  Okay.

22                  MR. TINKER:  And I would request

23  that -- I don't guess -- there's any way they can

24  get that mixed up with something in some other

25  Exhibit.  I would request that if it's sent back,

(C) S.Oballe 1995 -- All Rights Reserved

1  somewhere, is it not?

2                    MS. SAUM:  No, Your Honor.  If I

3  could remind the Court we talked about the limiting

4  instruction on extraneous offenses or conduct

5  and --

6                    THE COURT:  Well, no.  I meant --

7                    MR. SKURKA:  Which number three are

8  you looking at, Judge?

9                    THE COURT:  Oh, yeah.  I'll refuse

10 that.  I'll refuse number four; although aspects of

11 that are contained in my charge, and I also refuse

12 number five.  You may proceed.

13                    MR. TINKER:  You refuse number five,

14 Your Honor?

15                    THE COURT:  Yes.

16                    MR. TINKER:  Each of those, Your

17 Honor, was specific requested instructions and at

18 this time I object.  I think there are two ways to

19 preserve error with regard to the failure of the

20 Court to give certain instructions, and, first,

21 I've requested the instructions that this Court

22 gives and, secondly, now, I object to the Court not

23 giving those, and I request a ruling of the

24 Court --

25                    THE COURT:  Overruled.

                                                  2901

(C) S.Oballe 1995 -- All Rights Reserved

1    request the issue, special requested instruction

2    concerning the testimony, concerning the theft or

3    allegation of theft that the jury heard in the

4    guilt/innocence stage of the trial.  We requested

5    that and the Court did not include that at that

6    time.  We reurge defendant's requested instruction

7    number three.  And I have one that I'd like to file

8    at this time, which is defendant's request for

9    instruction, number three, and I tender to the

10   Court.  I'll file it -- the request concerning

11   the --

12                THE COURT:  All right.  It will be

13   refused.

14                MR. TINKER:  Your Honor, I also have

15   the requested instruction with regard to sudden

16   passion and adequate cause that we request.

17                THE COURT:  Well, this is new law so

18   I better look at this.  When did that become

19   effective?

20                MR. VALDEZ:  Last year, Your Honor.

21                MS. STERLING:  Seems like 1994.

22                MR. TINKER:  September.

23                MR. VALDEZ:  September 1.

24                THE COURT:  You guys want to be heard

25   on this?

3445

(C) S.OBALLE 1995 -- ALL RIGHTS RESERVED

```
 1                    BE IT REMEMBERED that on the

 2      21st day of December, 1995, the above entitled

 3      and numbered cause came on for hearing before

 4      the said Honorable Court, HONORABLE MIKE

 5      WESTERGREN, Judge Presiding, and the following

 6      proceedings were had:

 7

 8                    THE COURT:  Please be seated.

 9              Court calls for hearing in motion for

10      new trial.

11                    MR. MCGUIRE:  Judge, I probably

12      oughta make a little statement, just to clarify

13      where we are, on the record.

14                    On November 22nd, we prepared and

15      mailed to the 228th District Court, by

16      certified mail, an original motion for new

17      trial.  On that same date, we filed an

18      identical original with the 214th in

19      Corpus Christi.  The original motion that was

20      addressed to the 228th was apparently lost in

21      the mail.

22                    On the 27th of November, which was

23      the deadline for filing a motion for new trial,

24      Miss Patricia Saum filed a notice of filing of

25      original affidavit of Clara Castro Sanchez, the
```

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    Defendant's Motion for New Trial, and filed as

2    an attachment to that a copy of the motion for

3    new trial, which we had made to the 228th

4    District Court.

5            So, I just wanted the record to

6    reflect where we were on the paperwork.

7            THE COURT:  Duly noted.

8            MR. MCGUIRE:  Okay.  If the

9    Court is ready, we would call Arnold Garcia, to

10   the stand, Your Honor.

11           THE COURT:  Okay.  Is this a

12   factual matter?

13           MR. MCGUIRE:  Yes, Your Honor.

14           (Witness Sworn.)

15           Your Honor, before beginning the

16   questioning of Mr. Garcia, there are couple of

17   other matters that we have discussed with the

18   district attorney's office that we might take

19   care of.

20           Abraham Quintanilla, the father of

21   Selena, appeared on a Spanish television show,

22   _Premire Impacto_, on December 5th of 1995.  We

23   have a tape of that interview.  We, also, have

24   an English translation copy, of which we have

25   provided to the district attorney's office;

CYNTHIA MOTAL, CSR, RPR            4

1    and it's my understanding that both sides are

2    agreeable to stipulating that the tape is an

3    accurate reproduction of the interview on

4    Premire Impacto, and that the -- the

5    translation is an accurate translation.

6                    MR. SKURKA:  That's correct,

7    Judge.  Mr. Valdez viewed the tape -- not the

8    tape, but the program itself, and we've had the

9    transcript for a few days.  We don't doubt the

10   authenticity of it.

11                   MR. MCGUIRE:  At this time,

12   then, Your Honor, we would offer, as

13   Defendant's Exhibits 1 and 2, the videotape and

14   the transcript.

15                   THE COURT:  Admit.

16                   MR. MCGUIRE:  Your Honor, the

17   purpose of this offer goes to the point that we

18   raised in the motion for new trial regarding

19   the discovery issue of the records which -- the

20   financial records of the Selena Fan Club.  It's

21   my understanding that, during the trial, those

22   records were sought by the defense, that

23   records were provided to the Court by

24   Mr. Quintanilla, and that there was a

25   representation made that there were no relevant

CYNTHIA MOTAL, CSR, RPR                    5

NUMBER   6
IS ON REC. EX. # 24